## Imperial Irrigation Company v. Joe Jayne.

### No. 2166. Decided June 23, 1911.

**1.—Irrigation Company—Eminent Domain.**

Irrigation companies organized under the laws of Texas are quasi-public corporations entitled to exercise the right of eminent domain and subject to regulation by the Legislature. Borden v. Tres Palacios R. & I. Co., 98 Texas, 494, followed. (Pp. 399-410.)

**2.—Statutory Construction—Implied Intent.**

The legislative intent in enacting a statute must govern, and canons of interpretation are but grounds of argument for ascertaining it, whether it be an expressed intent or one derived from necessary implication. (P. 406.)

**3.—Same—Liberal Construction.**

A public grant for public advantage, such as the promotion of irrigation, is to be liberally construed and given such effect, if possible, as will carry out its purpose. (Pp. 406, 407.)

**4.—Same—Presumption.**

The Legislature, in passing the Irrigation Law, Act of March 9, 1895, Laws, 24th Leg., p. 21, must be presumed to have been familiar with the conditions prevailing in the arid belt of Texas, and the ownership of alternate sections there by the State. (Pp. 407, 408.)

**5.—Irrigation Company—Act of 1895—Implied Intent.**

The intent of the Legislature, by the passage of the Act of March 9, 1895, to provide for the acquisition by irrigation companies of dam and reservoir sites on the public school lands of the State, as well as on other lands privately owned and subject to condemnation therefor, is to be implied from the terms of the statute and the conditions existing at its passage.   (Pp. 407-409.)

**6.—Statutory Construction.**

Where, of two constructions which may fairly be given a legislative Act designed to effect a great public purpose such as encouragement of irrigation, one will carry out, and the other will defeat the intent and purpose of the Act, the former construction should be adopted.   (Pp. 409, 410.)

**7.—Irrigation Company—School Land.**

In view of the fact that appropriate sites for dams and storage reservoirs for irrigation purposes might not be found except on school lands, none such existing in the present case within forty miles of the location selected, and that the power to condemn private property for such purpose was given by the Act of March 9, 1895, but no power existed in the corporation either to condemn or to purchase school land therefor, the right given it to appropriate public waters for such purpose and designate the location of its dams and storage reservoirs is held to imply the power to acquire an easement for their construction and maintainance in school land covered by such designation, which would prevail over the rights of one subsequently purchasing the school land in question from the State. (Pp. 399-410.)

**8.—Same—Statutory Construction—Exclusion of Power by Enumerating Others.**

Article 3126, Revised Statutes (sec. 12, Act of March 9, 1895, Laws 24th Leg., p. 24) deals only with the subject of the right of way to be acquired by the irrigation corporation, in school land, for their ditches and canals, and the enumeration in such section of the powers conferred on them for that purpose does not restrict their implied right to an easement in the public lands of greater extent for the maintainance of dams, storage reservoirs, etc., which they are authorized to construct and designate locations for by other sections of the statute.   (P. 410.)

**9.—Constitutional Law—School Land—Grant of Easement.**

The Legislature has power to deal with the school lands in any manner not inconsistent with the express denial of the Constitution.  Smisson v. State, 71 Texas, 233.   (P. 411.)

**10.—Same.**

Article 7, sections 2 and 4, of the Constitution, in setting aside the alternate sections of land to the school fund and providing that they shall be sold for that purpose, did not deprive the Legislature of the right to grant easements over same for the promotion of public enterprises which would enhance their value to that fund; the grant of such easement for the maintainance of dams and storage reservoirs for an irrigation company is not distinguishable in principle from that for right of way for a railway, sustained in Texas Cent. R. Co. v. Bowman, 97 Texas, 421.   (Mr. Chief Justice Brown dissenting.)    (Pp. 410-423.)

Error to the Court of Civil Appeals, Fourth District, in an appeal from Pecos County.

Jayne sued the Irrigation Company for the recovery of land, and appealed from a judgment for defendant.   This being reversed and judgment rendered for plaintiff, the Irrigation Company obtained writ of error.

*O. W. Williams* and *Turney & Burges,* for plaintiff in error.—The statute granted by necessary implication the right to use any portion of public lands necessary to such storage and establishment of such

irrigation projects. Rev. Stats., arts. 3115 to 3131, inclusive; Texas Central Ry. Co. v. Bowman, 97 Texas, 417; Ayres v. Gulf, C. & S. F. Ry. Co., 39 Texas Civ. App., 563; Indiana Cent. Ry. Co. v. State, 3 Ind., 421; Pennsylvania R. R. Co. v. New York & L. B. R. Co., 23 N. J. Eq., 157; Davis v. East Tenn. etc., Ry. Co., 33 Tenn., 94; Delosier v. Penn. Canal Co., 11 Atl., 400; Haldeman v. Railway Co., 50 Pa. St., 485.

It is the duty of the court, in construing Acts making grants of power over property in aid of public utilities and for the advancement of the public good, to give them such construction as will carry out the intention of the Legislature, and that though it would be impossible to give full effect to the language used if the grants were by instruments of private conveyance. Winona, etc., R. R. Co. v. Barney, 113 U. S., 618; United States v. Denver & R. G. Ry. Co., 150 U. S., 1; Wisconsin Central R. R. Co. v. Forsythe, 159 U. S., 55; Johanson v. Washington, 190 U. S., 184; United States Trust Co. v. Atl. & P. R. R. Co., 47 Pac., 725; Babcock v. Western R. R. Corporation, 50 Mass., 553.

The State of Texas is vested with such an interest in and dominion over all the public lands within its borders as to enable it to grant rights of way over them, or reservoir sites on them, as it may reasonably deem conducive to the interests of the State and the people thereof, and to the enhancement of the value of the remainder of the property held by it. Texas Central Ry. Co. v. Bowman, 97 Texas, 417; Smisson v. State, 71 Texas, 222; Illinois Central R. R. Co. v. Illinois, 146 U. S., 452.

The trial court did not err in holding in its second conclusion of law, that the defendant, the Imperial Irrigation Company, was authorized and empowered under the provisions of art. 3126 of the Rev. Stats. of Texas, to appropriate an easement for canals, ditches, reservoirs and dam sites, over and on all unsold public lands belonging to the State. Rev. Stats., arts. 3115 to 3131, inclusive; Texas Central Ry. Co. v. Bowman, 97 Texas, 417; Ayres v. Gulf, C. & S. F. Ry., 39 Texas Civ. App., 563; Winona, etc., R. R. Co. v. Barney, 113 U. S., 618; United States v. Denver, etc., R. G. Ry. Co., 150 U. S., 1; Wisconsin Central R. R. Co. v. Forsythe, 159 U. S., 55; Johanson v. Washington, 190 U. S., 184; United States Trust Co. v. Atl. & P. R. R. Co., 47 Pac., 725; Babcock v. Western R. R. Corporation, 50 Mass., 553.

*Kennedy & Blackman* and *M. C. Jackson,* for appellee.—The Act of the Legislature of 1895, chapter 2, articles 3115 to 3131, inclusive, entitled "An Act to encourage irrigation," etc., providing for the appropriation of public waters for irrigation and providing means of acquiring such rights by persons and corporations, did not carry with it by implication, a grant of any of the State's public school land for reservoir or dam sites. Texas Central Ry. Co. v. Bowman, 75 S. W., 556; Pearne v. Coal Creek Min. & Mfg. Co., 18 S. W., 402; Tracy v. Atherton, 82 Am. Dec., 621; Collins v. Prentice, 38 Am. Dec., 61; Illinois Cent. Ry. Co. v. Illinois, 146 U. S., 387; Texas Cent. Ry. Co. v. Bowman, 97 Texas, 417.

The sovereign is never presumed to have parted with any of its

property, in the absence of conclusive proof of an intention to do so. Att. General v. Hudson T. Ry. Co., 27 N. J. Eq., 176.

The implied grant of an easement will not be presumed of necessity unless, (a) the easement be indispensable to the exercise of the right granted, and, (b) so apparent to the grantor at the time of the grant that he can reasonably be said to have known of and contemplated the necessity of such easement. Tracy v. Atherton, 82 Am. Dec., 621; Collins v. Prentice, 38 Am. Dec., 61; Baxter v. Schwiezer, 161 N. Y., 622; In re Brok Ave., 58 N. Y., 163.

The right to an easement can not arise from mere necessity. Necessity is only evidence inducive to the conclusion that the party making the grant intended to grant the easement necessary to the thing expressly granted. In the absence, therefore, of facts showing or tending to show that the grantor knew of, or was at least in a position to know of, the necessity of the right claimed, there can be no such thing as an implied grant, or a grant of necessity. Tracy v. Atherton, 82 Am. Dec., 621; Pettingill v. Porter, 85 Am. Dec., 676; Collins v. Prentice, 38 Am. Dec., 61; Nichols v. Luce, 35 Am. Dec., 302; Ellis v. Blue Mountain F. Assn., 41 Atl., 856; Allen v. Staley, 119 S. W., 755.

If the grantor, knowing at the time of the grant that the easement claimed was necessary, and yet refused to grant it, thus making certain his intent, no grant by implication could arise, however great the necessity. Golden v. Rupert, 80 S. W., 162; Lebue v. Boston, 52 S. W., 956.

Necessity arising after the grant will not support grant of easement by implication. Peters v. Worth, 64 S. W., 490.

A grantee can not so use his property as to create a necessity, and thereby entitle him to an easement in the property of his grantor. Staples v. Cornwall, 99 N. Y., 1009; Belser v. Moore, 84 S. W., 219.

All easements lie in grant, and can only be acquired from the owner of the fee; a trustee therefore could not so handle the property of his cestui que trust as to incumber it with an easement. Trump v. McDonnell, 120 Ala., 200; Healy Lumber Co. v. Morris, 33 Wash., 490, 99 Am. St., 964; Texas Central Ry. Co. v. Bowman, 97 Texas, 417; Tapert v. Detroit G. H. & M. Ry. Co., 15 N. W., 450; Patterson v. Griffith, 62 S. W., 884; Illinois C. R. R. v. Illinois, 146 U. S., 387; Washburn on Easements, 258; Bumstead v. Cook, 61 Am. St., 293.

Where the grantor provides a certain way by express grant, this evidences his intention to exclude every other way, and precludes the idea of a grant by implication of additional way, however necessary same may be. Haskell v. Wright, 23 N. J. Eq., 390; Hall v. City of Austin, 20 Texas Civ. App., 59; Pearme v. Coal Creek Min. & Mfg. Co., 18 S. W., 402.

Implied grants of easements in land are looked upon with jealousy, construed with strictness, and are not favored except in extreme cases. Baxter v. Schweizer, 161 N. Y., 622.

An easement based on grant by implication can not exist without some necessity therefor, and when the necessity ceases, the right to the exercise of the easement no longer exists. Alley v. Carlton, 29 Texas, 74; Benedict v. Johnson, 42 S. W., 335; Atkins v. Bordman, 37 Am.

Dec., 100; Ann Arbor F. & V. Co., v. Ann Arbor R. Co., 99 N. W., 869; Burnet v. Crane, 44 Am. St., 395; Cooper v. Maupin, 35 Am. Dec., 465.

In grants of this character, the sovereign only grants in express terms, and nothing passes by implication. Doubt is fatal. Ambiguity is fatal. Silence is negation, and only that which is clearly and unequivocally granted, can be said to pass. Charles River Bridge v. Warren Bridge, 11 Peters, 420; Rice v. Minn. & N. W. R. R. Co., 66 U. S., 358; Richmond T. & P. R. R. Co. v. Louisa R. R. Co., 13 How., 71; Mills v. County of St. Clair, 8 How. 569; Dubuque & Pac. R. R. Co. v. Litchfield, 64 U. S., 500; North Western Fertilizing Co. v. Hyde Park, 97 U. S., 659; Central Trans. Co. v. Pullman P. Car Co., 139 U. S., 24; Stein v. Binnville Water Co., 141 U. S., 67; Holyoke Water Power Co. v. Lyman, 82 U. S., 500; Coosaw Mining Co. v. State, 144 U. S., 550; Leavenworth L. & G. R. R. Co. v. United States, 92 U. S., 733; Slidell v. Grandjean, 111 U. S., 321; Pearne v. Coal Creek Min. & Mfg. Co., 18 S. W., 402.

MR. JUSTICE DIBRELL delivered the opinion of the court.

This suit was brought by Joe Jayne, as plaintiff, against the Imperial Irrigation Company, A. D. Jamison and Rose Allison, as defendants, to recover section No. 2 of block No. 9, Houston & G. N. Ry. survey, in Pecos County, Texas, consisting of 591.15 acres, and for damages in the sum of $10,000, alleged to have resulted from the construction of a dam or embankment on the land sued for. There was a prayer for an injunction to restrain defendants from maintaining upon plaintiff's land the dams, embankments, locks, gates, canals and flumes placed thereon by defendants, and to prevent them from flooding or covering with water his land.

The defendant, Imperial Irrigation Company, answered by general denial, plea of not guilty, and by special plea, in substance, that it was organized and incorporated under and by virtue of the laws of Texas on July 18, 1908, with authority and power to build, construct and use canals, reservoirs, reservoir sites, dams, dam sites, flumes and ditches for irrigation and other purposes in the county of Pecos and other counties in the State of Texas, and to appropriate for such purpose the unappropriated waters of the Pecos River and other streams, and the storm and rain waters of the Santa Rosa, Santa Lucia and other ravines, depressions and water sheds in said county of Pecos for such purposes and to an easement of a right of way one hundred feet in width for all canals, flumes, ditches, dam sites, etc., across, through and over all public and free school lands of the State of Texas, and also an easement in, on, over and through the public free school lands, or so much thereof as may be declared on and appropriated by said company for the use of dam sites and storage reservoir sites, whether the same be intended to be used for storage of water derived from streams and living water sources, or to be used for the empounding of storm and rain water, and to acquire by purchase or otherwise the rights and interests of other parties in and to same.

The Imperial Irrigation Company further pleading, specially alleged that, intending and desiring to avail itself of the powers and privileges

conferred on it by law and for the purpose of constructing canals, dams, flumes, ditches, and reservoirs in Pecos County for irrigation, and other purposes, on the 1st day of August, 1908, it duly filed its sworn statement of appropriation in writing and accompanied with maps, as required by law, in the office of the county clerk of Pecos County, Texas, and on September 12, 1908, filed in the office of the Commissioner of the General Land Office of the State of Texas, at Austin, a copy of said appropriation and began in good faith, on August 1, 1908, the construction of the canals, flumes, ditches, dams and reservoirs provided for and described in said appropriation. This appropriation embraced those portions of the land in controversy in this suit hereinafter set out.

This defendant further alleged that long before it made the appropriation on August 1, 1908, one D. Zimmerman, on January 31, 1908, made and declared his appropriation in the manner required by law of the waters and lands including the canals, dam sites, reservoir sites and any and all other waters and land involved in this suit, which declaration was properly filed in the office of the county clerk of Pecos County and in the office of the Commissioner of the General Land Office, and by the terms of such declaration the said D. Zimmerman acquired all of the waters and lands, the canals, dam sites, and reservoir sites involved in this suit, and now claimed by the Imperial Irrigation Company, and immediately after making such declaration and appropriation entered into the possession of the said lands and waters and began at once in good faith to construct the canals, ditches, dams, and reservoir sites as required by law until July 28, 1908, at which time for a valuable consideration the said Zimmerman sold, transferred and conveyed to the Imperial Irrigation Company said lands and waters, canals, dam sites and reservoir sites.

By reason of its purchase from Zimmerman of the land in controversy the water and other rights acquired by him under his said declaration and by reason of its subsequent declaration and appropriation, as heretofore set out, it acquired a portion of the land involved in this suit, amounting to 404.43 acres, embraced in its dam site and reservoir site, and 4/10 acres of section 2, block No. 9, Houston & G. N. Ry. Co. survey, of the section sued for. Said two tracts of land were set forth with minute description and field notes.

The Imperial Irrigation Company made all the allegations requisite to bring itself within the full benefits of the Irrigation Acts of March 9, 1895, and in addition to the foregoing pleas, improvements in good faith were suggested and an appropriate plea for the value of such improvements was made.

The cause was tried by the court without a jury and judgment rendered for the plaintiff, giving him possession of section 2 of block No. 9, Houston & G. N. Ry. Co. survey in Pecos County, consisting of 591.15 acres of land subject to a perpetual easement for a reservoir and dam site in connection therewith of 404.43 acres, and a perpetual easement for an irrigation canal and right of way on a part of said section of 4/10 acres of land. The remainder of the section of land was set aside to the plaintiff with a writ of restitution, and the perpetual ease-

ment awarded the Imperial Irrigation Company was fully protected by the court's judgment.

The defendants, Ross Allison and A. D. Jamison were properly disposed of, they claiming no interest in the subject matter of the suit.

In order that a clear understanding of the issues involved in this controversy may be had, we set forth the material findings of fact made by the trial court as follows:

"1. On June 4, 1909, section No. 2 of block 9, Houston & G. N. Ry. Co. in Pecos County, Texas, was public school land, and on the market for sale as such, having been duly surveyed, appraised, classified and advertised for sale.

"2. On June 30, 1909, the said tract of land was duly awarded to plaintiff, Joe Jayne, by the Commissioner of the General Land Office under his application to purchase the same theretofore duly and legally made and having complied with all the requirements of the law.

"3. On August 1, 1909, the said Joe Jayne went into possession of and became an actual settler on said tract of land, being the land described in plaintiff's petition herein, and on August 11, 1909, made and filed in the General Land Office his affidavit of settlement as required by law, and has continuously since said date occupied and made his home upon said land.

"4. The defendant Imperial Irrigation Company is a corporation duly organized under the laws of Texas by charter filed in the office of the Secretary of State on July 6, 1908, for the following purposes, to wit:

"The purpose for which it is formed is that set forth in article 3125, Sayles' Texas Civil Statutes, namely: 'The purpose of constructing, maintaining and operating canals, ditches, flumes, feeders, laterals, reservoirs, dams, lakes and wells, and of conducting and transferring water to all persons entitled to the same, for irrigation, mining, milling, to cities and towns for waterworks and for stock raising and of building storage reservoirs, for the collection and storage of water for the purposes aforesaid, and to do all things and exercise all powers allowed by law for carrying out the purpose.'

"5. The said charter expressly authorized the said defendant corporation to conduct its business and operations in Pecos County, Texas, where also its principal office is located.

"6. The defendant Imperial Irrigation Company is in possession of that portion of said survey No. 2 aforesaid as admitted and as described in their answer herein by metes and bounds, claiming an easement thereon for a storage reservoir and canals in connection with their irrigation project, basing their rights to said easements on the following facts only, to wit:

"(a) An appropriation made by D. Zimmerman as evidenced by affidavit and map filed for record with the county clerk of Pecos County, Texas, on January 31, 1908.

"(b) A written assignment of all of the rights of the said D. Zimmerman under and by virtue of the aforesaid appropriation made to the said Imperial Irrigation Company of date July 28, 1908, and filed

for record in the county clerk's office of Pecos County on August 17, 1908.

"(c) An appropriation made by said Imperial Irrigation Company as evidenced by affidavit and maps filed for record with the county clerk of Pecos County, Texas, on August 1, 1908.

"(d) That since said appropriations the work of construction has been prosecuted diligently and continuously by the respective parties.

"7. On the question as to whether or not that portion of plaintiff's survey 2 in use by defendant Imperial Irrigation Company, in connection with its Imperial storage reservoir is indispensable to said reservoir, I find as follows:

"(a) It would be possible to construct a dam in such manner as to eliminate all of said survey 2 from said reservoir, but to do so is impracticable for the following reasons:

"It would necessitate constructing a much higher and longer dam than is now needed to hold and retain the water.

"Shallow sheet water would prevent excavation for the dirt for the new dam and dirt would have to be brought from a distance at a greatly increased cost.

"The testimony of experts shows it to be impracticable from an engineer's standpoint, owing to the great cost rendering it commercially prohibitive.

"(b) That said Imperial storage reservoir site so appropriated as aforesaid including that portion of survey 2 described in connection therewith is a natural reservoir site, being basin shape, of great capacity and having a large drainage area and is indispensable to the Imperial Irrigation Company's scheme of irrigation in connection with the Imperial canal.

"There is no other reservoir site of adequate capacity accessible to said Imperial Irrigation Company for the storage of water taken by it from the Imperial canal headgate on the Pecos River.

"(d) I find as a fact that said Imperial storage reservoir is indispensable to defendant's Imperial Irrigation Company's scheme of irrigation, and that said site including that portion of survey No. 2 used in connection therewith is indispensable to the said reservoir.

"8. I find that the site of the Imperial canal and reservoir and its irrigation system and the land to be irrigated therefrom are within the arid district of Texas where the natural rainfall is not sufficient for agricultural purposes."

There is no serious controversy in the case as to the lack of compliance with the Irrigation Act of 1895, on the part of the defendant, and the only questions presented for decision are, first, whether, by the provisions of the irrigation statute of the Twenty-fourth Legislature, of date March 9, 1895, and as amended at the same session, any portion of the public school lands situated in the arid section of Texas, where the rainfall is not sufficient for agricultural purposes, was by either direct terms or by necessary implication granted to any person, corporation, or association of persons for dam sites and reservoir sites for storing and empounding waters for the purposes of irrigation upon complying with the terms of the provisions of such Act, and second, whether the Legislature had authority to grant an easement on any portion of

the public school lands for any purpose however laudable, or in further-ance of any policy, however well defined for the country's progress, or for the enhancement of the value and better disposition of such school lands situated in the arid or semi-arid sections of the State, where the rainfall is insufficient for agricultural purposes. In other words, if the Act under discussion granted to defendant, after complying with its requirements, an easement on that portion of the public school land in controversy in this suit for a dam and reservoir site for empounding and retaining water to be distributed for irrigation purposes, did the Legislature have power to grant such easement?

In addressing ourselves to the question whether the legislative Act under investigation granted by necessary implication an easement on the public school land for dam or reservoir sites, it will be necessary to quote some of the more material provisions of the Act showing its purpose, intent and scope. The preamble of the Act is as follows:

"An Act to encourage irrigation and to provide for the acquisition of the right to the use of water and for the construction and main-tenance of canals, ditches, flumes, dams, reservoirs and wells for irri-gation and for mining, milling, the construction of water works for cities and towns and stock raising."

"Article 3115. The unappropriated waters of the ordinary flow or underflow of every running or flowing river or natural stream, and the storm or rain waters of every river or natural stream, canyon, ravine, depression or water shed within those portions of the State of Texas in which, by reason of the insufficient rainfall or by reason of the irreg-ularity of the rainfall, irrigation is beneficial for agricultural pur-poses, are hereby declared to be the property of the public, and may be acquired by appropriation for the use and purposes and in the man-ner as hereinafter provided."

"Article 3116. The storm or rain waters, as described in the pre-ceding article, may be held or stored in dams, lakes or reservoirs built and constructed by a person, corporation or association of persons for irrigation, mining, milling, the construction of water works for cities and towns, or stock raising, within those portions of Texas described in the foregoing article, and all such waters may be diverted by the per-son, corporation or association of persons owning or controlling such dam, reservoir or lake for irrigation, mining, milling, the construction of water works for cities and towns, and stock raising."

"Article 3120. Every person, corporation, or association of persons who have constructed or may hereafter construct any ditch, canal, re-servoir, dam or lake for the purposes named in this chapter, and taking the water from any natural stream, storage reservoir, dam or lake, shall within ninety days after this chapter goes into effect, or within ninety days after the commencement of such construction, file and cause to be recorded in the office of the county clerk of the county where the headgate of such ditch or canal may be situated or to which said county may be attached for judicial purposes, in a well bound book to be kept by said clerk for that purpose, a sworn statement in writing showing approximately the number of acres of land that will be irri-gated, the name of such ditch or canal, the point at which the headgate thereof is situated, the size of the ditch or canal, in width and depth,

and the carrying capacity thereof in cubic feet per second of time, the name of said stream from which said water is taken, the time when the work was commenced, the name of the owner or owners thereof, together with a map showing the route of such ditch or canal; and when the water is to be taken from the reservoir, dam or lake, the statement above provided for shall show in addition to the ditch and other things provided for, the locality of the proposed dam, reservoir, or lake, giving the names or numbers of the surveys upon which it is to be located, its holding capacity in cubic feet of water, the acreage and surface feet of land that will be covered, and the limits of such lake, reservoir or dam, and the area of the water shed from which the storm or rain water will be collected."

"Article 3122. Any person, firm, association of persons or corporation may acquire the right to and appropriate for irrigation purposes the unappropriated waters of the ordinary flow or underflow of every running or flowing river or natural stream, and the storm or rain water of every river or natural stream, and the storm or rain water of every river or natural stream, canyon, ravine, depression or water shed within those portions of the State referred to in article 3115, by filing a sworn statement in writing, to be recorded as provided in article 3120, declaring his or their intention of appropriating such water. Said statement shall also show approximately the number of acres of land proposed to be irrigated, the name of such ditch or canal, the point at which the headgate thereof will be situated, the size of the ditch or canal in width and depth, and the carrying capacity thereof in cubic feet per second of time, the name of the person, firm, association or corporation appropriating such water, the name of the stream, and shall attach to such statement a map showing approximately the proposed route of such ditch or canal; and when the water sought to be appropriated or acquired is storm or rain water, the statement above required shall also show or describe the locality of the proposed dam, reservoir, or lake by giving the names or numbers of the surveys upon which it is to be located and approximately the following, that is to say, its holding capacity in cubic feet of water, the acreage of land that will be covered and the area of the water shed from which the storm or rain waters will be collected; provided, any person, association of persons or corporation who has heretofore had a survey made of the proposed route of his or its ditch shall have a preference right at any time within ninety days from the time this chapter shall take effect to file the statement hereinbefore required for the appropriation of water. Within ninety days next after filing of said statement the party or corporation claiming the right to appropriate the water shall begin actual construction of the proposed ditch, canal, dam, lake or reservoir, and shall prosecute the work thereon diligently and continuously to completion."

"Article 3126. All corporations and associations formed for the purpose of irrigation, mining, milling, the construction of water works for cities and towns, and stock raising, as provided in this chapter, are hereby granted the right of way, not to exceed one hundred feet in width, over all public free school, university and asylum lands of the State, with the use of the rock, gravel and timber on the right of way

for construction purposes, and may obtain the right of way over private lands by contract. Any such corporation or association of persons, or any city or town, may also obtain the right of way over private lands, and also the land for dam sites and storage reservoirs and the water belonging to the riparian owner by condemnation, by causing the damages for any private property appropriated by any such persons, corporations or associations to be assessed and paid for as provided in cases of railroads, and the delay necessary to condemn and acquire the property needed for the ditch, dam site, reservoir and sewers for water supply and drainage or water of the riparian owner shall not work to the prejudice of the person, corporation or association of persons constructing such ditch, canal, lake, reservoir or dam, and shall not be taken into account in estimating the time for the completion of such work."

By article 3115 the unappropriated waters are declared public property in the arid or semi-arid portions of the State.

By article 3116 the power is given to any person, corporation or association of persons for irrigation purposes to hold or store such storm or rain waters, so declared public property in dams, lakes or reservoirs to be built or constructed by such person, corporation or association of persons.

By article 3117 provision is made for the diversion of the ordinary flow or underflow of water of the natural rivers or streams in the arid or semi-arid sections of the State and the right of eminent domain is given.

By articles 3120 and 3122 the method of acquiring the right to and appropriating for irrigation purposes the unappropriated waters made public property by article 3115 is provided for.

By article 3125, not quoted herein, provision for the organization and incorporation of companies for irrigation purposes is made, and article 3126 provides for the right of way for ditches and canal over the public lands of the State, and gives the right of condemnation for purposes of ditches, canals, dam, and reservoir sites over and on private property.

No question is raised as to whether the right of irrigation companies organized under the Act of March 9, 1895, to condemn private property is a taking for public use in contemplation of article 1, section 17 of the Constitution. The question seems to be definitely and satisfactorily settled in this State that such irrigation companies are quasi-public corporations, entitled to the benefits of the exercise of eminent domain and subject to regulation by the Legislature. It was so held by this court in the case of Borden et al. v. Trespelacios Rice & Irrigation Company, 98 Texas, 494, 107 Am. St., 640, and we shall treat them as such.

What prompted the passage of this Act by the Legislature will be the next inquiry. It will be seen from the preamble to the Act, as given above, that the evident intent of the Legislature was to *encourage* irrigation within those portions of the State in which, by reason of the insufficient rainfall or by reason of the irregularity of the rainfall, irrigation became beneficial for agricultural purposes. If it was the purpose of the Legislature to encourage irrigation in those sections

mentioned by the passage of this law it becomes a pertinent inquiry to ascertain how the Legislature intended that such encouragement should be effected. The Act gives no bonus for the construction and maintenance of ditches or canals or for the construction of dams or reservoirs. It gives no additional condemnation rights over the Act of 1889, except in so far as condemning private property for dam and reservoir sites. The distinct characteristics of the Act constituting the encouraging feature, if it exists at all, must be found in the fact that the Act gives the right to take the unappropriated waters and to construct dams and reservoirs to hold such waters for distribution. The power to condemn private property for the building of such storage dams and reservoirs is given by the Act, as is also the right of way for ditches and canals over the public lands and the right to condemn private property for such ditches and canals. It follows therefore that unless by necessary implication the right to take portions of the public school land for such dam and reservoir sites was given by such Act, it becomes a dead letter, when, as in this case, the land in controversy is absolutely essential to the irrigation project designed. The right of eminent domain could not exist as to land yet public and hence no such power was given by the Act.

If it can be shown that it was the intent of the lawmakers, after having declared the unappropriated waters of the arid and semi-arid portions of Texas property of the public, and authorizing their empoundment and storage in dams and reservoirs for irrigation purposes, to authorize any person, corporation or association of persons on specified conditions to appropriate an easement on any of the public school lands for dam or reservoir sites for empounding and storing such waters for the purposes designated in the Act when necessary to the installation of such irrigation project, then such intent becomes as much a part of the Act as if it had been expressed in plain and unequivocal terms. This doctrine was laid down by this court in the case of Mills County v. Lampasas County, 90 Texas, 606, as follows: "Strictly speaking there is but one rule of construction, and that is, the legislative intent must govern. All other canons of interpretation so called are but grounds of argument resorted to for the purpose of ascertaining the true meaning of the law."

The Act under investigation is a public grant for public advantage, seeking to reclaim a vast portion of our State from barrenness and nonproductiveness and to enhance the value of the public school lands situated in the arid and semi-arid districts by subjecting them to the magic of irrigation, and being a public grant for public advantage must be liberally construed. Not only should this Act be liberally construed as authorized by the great weight of authority, but in view of the fact that it is the decree of the sovereign speaking through its representatives in an endeavor to accomplish a public purpose, the promotion of irrigation in a vast section of country in dire need of it, such construction should be given the Act, if possible, as will carry out such purpose. The rules of construction applicable to public grants to private persons for private purposes with incidental resultant good to the public, or as applicable to grants between private parties, are

not applicable to the grants of the character of that contained in the Act under investigation.

In support of the doctrine that public grants for public purposes should receive a broad and liberal construction we desire to refer to and quote from some of the authorities most accessible. In the case of Bradley v. The New York & New Haven R. R. Co., 21 Conn., 306, on this subject, the Supreme Court of that State say: "The rules of construction, which apply to general legislation in regard to those subjects in which the public at large are interested, are essentially different from those which apply to private grants to individuals, of powers or privileges designed to be exercised with special reference to their own advantage, although involving, in their exercise, incidental benefit to the community generally. The former are to be expounded largely and beneficially for the purposes for which they were created."

In the case of United States v. Denver, etc., R. R. Co., 150 U. S., 14, in discussing a subject akin to that here under consideration, the Supreme Court, speaking through Justice Jackson, lays down this proposition: "Looking to the condition of the country, and the purposes intended to be accomplished by the Act, this language of the court furnishes the proper rule of construction of the Act of 1875. When an Act, operating as a general law, and manifesting clearly the intention of Congress to secure public advantages, or to subserve the public interest and welfare by means of benefits more or less valuable, offers to individuals or to corporations as an inducement to undertake and accomplish great and expensive enterprises, or works of a quasi-public character in or through an immense and undeveloped public domain, such legislation stands upon a somewhat different footing from merely a private grant, and should receive at the hands of the court a more liberal construction in favor of the purposes for which it was enacted."

Mr. Justice Field, speaking for the Supreme Court of the United States in the case of Winona & St. Peters Ry. Co. v. Barney, 113 U. S., 625, discussing a question similar to the one now under consideration, laid down the following rule: "The solution of these questions depends, of course, upon the construction given to the Act making the grants; and they are to receive such a construction as will carry out the intent of Congress, however difficult it might be to give full effect to the language used if the grants were by instruments of private conveyance. To ascertain that intent we must look to the condition of the country when the Acts were passed, as well as to the purpose declared on their face, and read all parts of them together."

In consonance with the rule laid down in the authorities above quoted from we must assume that the legislators who enacted this law were familiar with the condition of the arid and semi-arid portions of Texas, where a major portion of the public school lands are located, and with the fact that those lands are located in alternate sections. They were likewise familiar with the fact that thousand upon thousand of acres of this land located in such regions is of little value without water, and that with water in abundance the soil in those arid regions is as fertile and productive as the valley of the Nile. They knew and realized, from the history and experience of irrigation legislation in

this State extending over a period of fifty years, wherein Act after Act of the Legislature of this State offered and gave as a bonus to any person or corporation from two to eight sections of land to the mile for the construction and maintenance of irrigation ditches and canals with the hope of encouraging irrigation in those sections of the State where from the insufficiency or irregularity of the rainfall agriculture is not profitable as a business, and that on account of the scarcity of running streams in those sections of the State capable from the natural flow of water to irrigate any considerable amount of land. Having in view the history of this legislation and its inefficiency by the ditch or canal system from natural streams to accomplish the ends designed, and imbued with the knowledge of the more recent conclusions reached by a close and thorough study of the subject of irrigation by scientific and practical engineers, set in motion by a national interest in the subject, that the reclaimation of the great arid or semi-arid sections of this State could be effected only by the conservation of the rain and storm waters and the surplus flow of natural streams and rivers—having all these things in view, the system of empounding and storing such water by dams and reservoirs was conceived. It is worthy of note that in no general legislative Act prior to 1895 was there ever any provision made for empounding waters in dams, reservoirs or lakes, and giving the right to exercise eminent domain by condemning lands for dam and reservoir sites.

It follows in consequence of these facts that it must have been the moving purpose of the Legislature in the passage of the Irrigation Act of 1895, to provide for the taking and condemnation of sites for dams and reservoirs, in order to create an effective law encouraging irrigation in those sections of the State mentioned in the Act, and we so declare in our judgment the same to have been the legislative intent.

Aside from the opinion that it was the legislative intent by the passage of the Act under discussion to provide for the acquisition of dam and reservoir sites on the public school lands as well as on all other lands, when necessary, to the creation of irrigation projects, we think the right to acquire such easement on the public school lands for the dam and reservoir sites is clearly given in the Act by necessary implication. The lawmakers must have known, as hereinbefore stated, that public school lands were located in alternate sections, and that on account of the topography of the country, in the very nature of things, sites suitable for reservoirs large enough to empound and hold water in sufficient quantities for irrigating large areas of land could not be constructed without taking some portion of the public school land, and that such sites for such reservoirs do not exist and are not of course to be found everywhere. The proof in this case shows that not another basin suitable for the construction of a reservoir could be found within forty miles of the one located by the defendant. So that it is logical and reasonable to conclude and illogical and unreasonable not to conclude that when the lawmakers declared the unappropriated waters of the State the property of the public and gave the power to any person, corporation or association of persons to construct dams and reservoirs for the purpose of empounding such waters for irrigation purposes, and no power of condemnation could be given so as to affect

such public school lands, the authority to appropriate any portion of such lands as were necessary to construct the dams and reservoirs was clearly given by necessary implication.

In the case Ayres v. Gulf, C. & S. F. Ry. Co., 39 Texas Civ. App., 563, 88 S. W., 437, Judge Gill, in discussing the question of implied grants for public use in a railroad case, under a charter granted in 1866 which authorized the road to build through certain counties without granting a right of way, held that the grant was by implication in the following language: "While it is not expressly held, nor was it necessary to be decided in the case cited (Texas Cent. Ry. Co. v. Bowman, 97 Texas, 417), it is inferentially held that prior to the passage of the Act, a charter, authorizing the construction of a railway through a country held in part by private ownership and in part by the State, the general laws providing for acquisition of right of way from private owners, but leaving the company powerless against the lands of the State, impliedly granted the right to construct through and over the public domain. The grant is so necessary to the exercise of the general power conferred, it is inevitably carried by the general terms of the grant. This is in accord with the elementary rule of construction that a power necessary to the exercise of a power already granted will be implied. We are of opinion, therefore, that by its charter the Great Northern Company acquired the right to enter upon and appropriate so much of the public domain over which its route was projected as was necessary for its right of way, not to exceed the prescribed width, and that, having done so, the width actually appropriated was not affected by the subsequent grant by the State of the Lang survey."

If this is not the correct rule of statutory construction how are we to brush aside and ignore that well recognized principle that the grant of an express power carries with it by necessary implication every other power necessary and proper to the execution of the power expressly granted? This doctrine has been recognized and established in the following authorities. Railway Co. v. Bowman, 97 Texas, 417; Smisson v. State, 71 Texas, 235; Ayres v. Gulf, C. & S. F. Ry. Co., 39 Texas, 561; Babcock v. Western Ry. Co., 50 Mass. (9 Metc.), 553; Sutherland on Stat. Const., 341.

Again it was shown by the evidence in this case that without the authority to take and use that portion of the land in controversy necessary for defendant's reservoir site the Act under consideration as it relates to the defendant would be ineffectual to accomplish the purpose of its enactment.

This brings us to the consideration of another well established rule of statutory construction, that where there are two constructions that may be fairly given a legislative Act designed to effect a great public purpose such as the encouragement of irrigation, one of which will carry out the intent and purpose and the other will defeat the intent and purpose of the Act, the former construction should be applied. The following quotation will perhaps more clearly state the rule here involved: "Where the grant admits of two interpretations, one of which is more extended and the other more restricted, so that a choice is fairly open, and either may be adopted without a violation of the apparent object of the grant if, in such a case, one interpretation would

render the grant inoperative, and the other give it force and effect, the latter should be adopted." Black on Interpretation of Laws, p. 316 (sec. 119).

A practical application of this rule of construction to the Irrigation Act of 1895 in the light of the facts herein stated, leads us logically to the conclusion that the right to acquire an easement in the land in controversy, then a part of the public school lands of the State, for the purposes of a dam and reservoir site, was by implication granted.

In holding with Justice Neill in his dissenting opinion and against the majority of the Court of Civil Appeals we desire to state that we share with Judge Neill the same high regard he entertains for his learned associates. However, after a careful consideration of the Act in all its phases we can not refrain from the belief that the view taken by the majority of the Court of Civil Appeals is too narrow in its application and not justified by the terms of the Act itself. In singling out article 3126 as a pivotal provision of the Act and holding that the express grants therein made, by implication restricted the entire Act to such grants as contained in that article can not be, in our judgment, sustained upon principle, when it is made to appear from other provisions of the Act that the article singled out by the Court of Civil Appeals is of minor importance in comparison with other provisions of the Act. Article 3126 deals with the subject of ditches and canals and the right to their acquisition, whereas articles 3115, 3116 and 3117 deal with the vital parts of the Act, and without the provisions of which the Act would be entirely useless as a means to encourage irrigation. These articles make the unappropriated waters of the State public property, provide for the diversion and underflow of rivers and running streams and provide for empounding and diverting by the construction of dams and reservoirs, and independent of article 3126, article 3117 gives the right of eminent domain. The subject matter of the three first articles is distinctly and essentially different from the subject matter of the one selected by the Court of Civil Appeals as furnishing restrictions in the grant of the entire Act. In giving heed to one rule of construction, a number of such rules, each of equal importance with the one adopted, are ignored and by such narrow and, as we think, unwarranted construction, the entire Act is rendered ineffectual to accomplish the ends designed and thereby is thwarted a great public purpose.

We come now to a discussion of the second question as to whether or not the Legislature at the time of the passage of the Act under investigation had authority under the Constitution to grant an easement on any portion of the public school lands of the State for dam and reservoir sites for purposes of irrigation, etc., in those portions of the State in which by reason of the insufficient rainfall, or by reason of the irregularity of the rainfall, irrigation is beneficial for agricultural purposes.

It would seem that, inasmuch as in the decision of this case by the Court of Civil Appeals, on a portion of the land claimed by the plaintiff, there is given to defendant a perpetual easement for the construction of its ditches and canals, by virtue of such decree the legislative authority to grant an easement on and over the public school lands is recognized and upheld. Unquestionably this is the holding of that

court, for the authority of the Legislature is as directly called into question where it makes an express grant as where the grant is by necessary implication only, and no difference in principle exists whether the grant was for an easement for a ditch and canal or dam and reservoir sites.

From the view we take of the law it seems to us to be settled by the decisions of this State that the Legislature has power to deal with the public school lands in any manner not inconsistent with the express denial of the Constitution. As stated by Judge Stayton in Smisson v. State, 71 Texas, 233, in discussing that section of the Constitution, section 4, article 7, invoked in this case in denial of the legislative authority to grant an easement on any portion of the public school lands of the State for dam and reservoir sites, "A power clearly legislative in its character, not expressly denied to the Legislature, ought not to be held denied by implication, unless its exercise would interfere with, frustrate, or to some extent defeat the exercise of a power expressly granted."

It has been held and it seems with great force of reason that the purpose of the Constitution was not to restrict the Legislature in dealing with the public school lands further than to say they shall be sold, and that the purpose of the constitutional provision was not to fetter the Legislature with restrictions so narrow as to deprive it of the exercise of that generous and wise policy in dealing with the public domain in order to foster public enterprises and thereby promote the general welfare of the whole people. Such a construction of the Constitution would deny the Legislature the power to authorize the opening of public roads over the public school lands, or the granting of rights of way to railroad companies, or sites for public school houses, or sites for dams or reservoirs to furnish water to the people of our cities located in the arid and semi-arid sections of the State. It would also stop the building of telegraph and telephone lines and cripple the entire commerce of the country.

What has been said in Texas Cent. Ry. Co. v. Bowman, 97 Texas, 421, is so decisive of the question under discussion and is said with so much force and learning, and while said in regard to railway companies is nevertheless applicable to irrigation companies, that we desire to quote freely from that opinion. In that case the railroad company designated and occupied a strip of land across an alternate section of school land for purpose of a right of way, and afterwards said section was purchased by the plaintiff below from the State. The question of legislative authority to grant railroad companies a right of way on such lands was the subject of discussion. In that case Judge Williams said: "It is claimed that the Legislature is without power to grant such rights of way over school lands because of the provision of the Constitution in the second section of article 7 that, 'all the alternate sections of land, etc., shall constitute a perpetual school fund;' and in the fourth section of the same article that: 'The lands herein set apart to the public free school fund shall be sold under such regulations, at such time, and on such terms as may be prescribed by law.' Other constitutional provisions, more or less affecting the question before us, are section 17 of article 1, 'that no person's property shall be

taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person;' sections 1 and 2 of article 10, which give to any railroad corporation organized under the law for the purpose, 'the right to construct and operate a railroad between any points within this State,' and declare railroads to be public highways; and of section 3 of article 14 recognizing the power of the Legislature to continue the policy previously characterizing legislation in this State, of granting to railroad companies lands in aid and encouragement of the construction of railroads, but putting upon the power certain restriction which had not always existed. The building of railroads is here recognized, as it has always been in our legislation and in the law generally, as a public purpose, the promotion of which justifies the use of public property and the taking of private property. The power to provide for the doing of these things is legislative in character and is vested in the Legislature subject to constitutional limitations. The only express restrictions are those contained in section 17, article 1, and section 3, article 14. The first evidently applies only to property in which others than the State are interested; but if it were held to apply to property belonging to the State, it would authorize the taking of it with the consent of the State, which only the Legislature could give. The second contains no inhibition against the exercise of such power as that here in question, but recognizes the existence of a much broader one and puts certain express restrictions upon it. It is not meant that the lands, grants of which are authorized by this latter provision, include school lands, but only that it puts upon a power to grant lands which otherwise existed certain express limitations, which do not include a denial of the power to grant to railways a right of way over lands belonging to the State. The power of the Legislature to devote the general property of the State to public purposes, without other compensation than such as arises from the advantages resulting from such use of it, is therefore not only not taken away, but is expressly recognized, and, unless the power here in question is excluded by the provision on which defendants in error rely, it must be held to exist. If the contention, based upon the provisions creating and providing for the disposition of the school fund, that they take away all power from the Legislature to grant rights of way over the lands thus appropriated, is sound, it follows that these lands can not be subjected to any public use whatever, or dealt with otherwise than by outright sales. The objection would apply equally to legislative attempts to authorize the location upon them of public roads, court houses and even public school houses; for the contention is, in effect, that, as the lands must be sold, nothing else can be done with them. This argument loses sight of other legislative powers which inhere in the sovereign and which are conferred by the sovereign upon the Legislature. Such restriction upon legislative action as there may be in the provision last referred to are implied, and can not be held to exclude the existence of other powers, further than the latter may be inconsistent with the accomplishment of the objects of those provisions."

On this same subject, page 423, Judge Williams says further: "The sections of the Constitution concerning the school fund were adopted with knowledge of the existence of other legislative powers arising out

of the same instrument, and are therefore to be construed with due regard to other powers. Limitation may arise by implication from them which would exclude the power to divert the fund to other purposes, or to provide for a different method than that prescribed for finally utilizing the land to produce moneys for the support of the schools. Smisson v. State, 71 Texas, 235. But the exercise of other powers upon the lands may not necessarily tend to defeat these limitations or the purposes which they were meant to secure. As we have said, the construction of railroads has been regarded, in all of our legislative history and in the Constitution itself, as a legitimate means of settling, improving and developing the resources of the State. The power to grant rights of way over the State's property had always been exercised as a proper means of securing these results. This power is not expressly denied by the Constitution, and as, judged by our own legislative history and the Constitution itself, it is to be regarded not as an impediment, but as a help to the prescribed utilization of the school fund, it should not be held to have been denied by implication. In other words, the appropriation of these lands and the command to sell them were made in contemplation of the existence of other legislative powers which might be employed consistently with and in aid of the objects in view. The right granted to any company is only to the narrow strip of land, of which the fee is not acquired by the railroad company but remains in the State, subject to its disposal; and the right of the railroad company is held subject to all conditions and limitations which by law attach to such property. No legitimate exercise of the power to grant such rights can materially impede the exercise of the other powers conferred over the school lands."

In our opinion the authority of the Legislature to deal with the public school lands by granting easements thereon for the building of dams and reservoirs for the storage of large bodies of water for irrigation purposes, being in furtherance of the value of such lands, is a power rather expressly given by the Constitution than denied by implication. This view is also strongly supported by the Bowman case, from the opinion in which we further quote: "The purpose for which the school lands are required to be sold is the raising of money to support the schools, and this may be prompted in many ways by the exercise of other powers of the Legislature. Such powers are left in that body by the Constitution, and may be employed upon this land whenever the attempted exercise does not conflict, and especially where it promotes, the power to sell to advantage. To the advancement of the purpose of selling the lands advantageously, by settling up the country, bringing them into demand and thereby increasing their value, the Legislature might well regard the granting to railroad companies of rights of way over them as a legitimate means."

It has been said that the Bowman case is not decisive of the instant case for the reason that the view taken in that case was founded mainly on the reason that the Constitution had provided for the building of roads within the limits of this State, and based on the doctrine that where there is given an express power to do a thing every other power necessary to carry into execution such express power is implied and such provision being a part of the Constitution aided greatly the construction given that instrument by the court in the Bowman case. To

this suggestion we make two answers.    First, we say the court in the Bowman case held that the Legislature had authority to grant the railroad companies rights of way over the public school lands independent of any constitutional clause providing for their right to construct their roads within the limits of the State, and second, we suggest that if the provision referred to in the Constitution aids the construction given it in the Bowman case, then the same rule should apply in the case at bar, for the reason that such corporations formed under the Irrigation Act of 1895 are *quasi* public, and property taken by such companies under said Act is for a public use and has the sanction of the Constitution as effectually as railroad companies which are authorized to construct and operate railroads between any points within the State, or as effectually as the Commissioners' Court of the State to lay out public roads over the .public school lands.

In support of the foregoing contention we quote again from the Bowman case, page 424: "Another view of the Constitution sustains this legislation.    The Legislature is permitted to provide for the incorporation of railroad companies by general law only (article 3, section 56), and it is provided that such companies 'shall have the right to construct and operate a railroad between any points in this State.' This gives the consent of the people of the State for the Legislature, in the laws to be enacted, to authorize such construction and operation so far as it affects the State only.    A limitation is expressed in section 17 of article 1 which secures compensation for private property taken, but no such reservation is made in favor of the State.    These provisions operate along with those with regard to the school fund, and the power given affects those lands as well as others belonging to the State."

It has been suggested by counsel for the plaintiff below that this case is distinguishable from the Bowman case for the reason that a greater quantity of the public school land is required for reservoir sites than for railroad rights of way.    Such a contention is without force, for the reason that the principle involved is the same, and for the further reason that in the very nature of things, the condition of the country's topography and the manner of the location of the school lands in alternate sections renders it impossible that in any given case any great portion of the corpus of such land could be taken.    The portion that could be taken in any given case and in the aggregate by companies organized under said Act are in comparison with the benefits to be received by the great body of the public school lands almost infinitesimal.

The suggestion that the State has parted with its title to the public school lands by dedicating the alternate sections to the purpose of a public school fund is fully answered by the opinion of Judge Stayton in the Smisson case, wherein he held that such lands belonged to the State as they did before they were appropriated by the Constitution to the public purpose, subject to the limitations expressly contained in the Constitution, which are held not to be inconsistent with the grants of easements for public uses.    This is likewise the holding by the Supreme Court of the United States in the case of Illinois Cent. R. R. Co. v. Illinois, 146 U. S., 452, in which the question was involved whether the Legislature of Illinois had power to grant all the lands lying beneath the navigable waters of Lake Michigan.    The court held

that it was not within the power of the Illinois Legislature to grant all ·ot the lands beneath the navigable waters of Lake Michigan and especially beneath the harbor of the city of Chicago, but that it was within its power to grant portions of such lands. On this question the court said, speaking through Justice Field: "It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties. The interest of the people in the navigation of the waters and in commerce over them may be improved in many instances by the erection of wharfs, docks and piers therein, for which purpose the State may grant parcels of the submerged lands; and, so long as their disposition is made for such purpose, no valid objection can be made to the grants. It is ·grants of parcels of land under navigable waters, that may afford foundation for wharfs, piers, docks and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and waters remaining, that are chiefly considered ·and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the State." . . . "The control of the State for the purposes of the trust can never be lost, except as to such parcels are as used in promoting the interest of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. It is only by observing the distinction between a grant of such parcels for the improvements of the public interest, or which when occupied do not substantially impair the public interest in the lands and waters remaining and a grant of the whole property in which the public is interested, that the language of the adjudged cases can be reconciled." . . . "The trust with which they are held, therefore, is governmental and can not be alienated except in those instances mentioned of parcels used in the improvement of the interest thus held, or when ·parcels can be disposed of without detriment to the public interest in the lands and waters remaining."

So that it is our conclusion that the Legislature had authority to grant easements on the public school lands of the State for the construction of dams and reservoirs for irrigation purposes.

In arriving at this conclusion we are not unmindful of those constitutional provisions relating to the public school lands and the public school fund, providing for the perpetuation and nondiversion of that fund around which the organic law has placed an armor forged by the strong arm of the sovereign people, and no less are we impressed with the sacred obligation to obey its mandates and construe its language and meaning in such manner as may comport with that obligation. This we believe we have done and in so doing will have added to instead of taking from or diverting that fund.

One of these provisions is section 4 of article 7 of the Constitution, which provides, "the lands herein set apart to the public free school fund, shall be sold under such regulations at such times, and on such terms, as may be prescribed by law; and the Legislature shall not have power to grant any relief to purchasers thereof." There were in this

State great jurists who contended before the Supreme Court of this State that in view of that provision of the Constitution the Legislature could not lease or authorize the leasing of such lands and could do nothing in regard to them except to sell them. It was contended that inasmuch as the positive direction was given by the people in their Constitution that the lands which they had dedicated to the fund of the public schools, should be sold, a positive inhibition arose by implication to do anything with said lands but to sell them. In reply to this contention that great constitutional lawyer, Chief Justice Stayton, in Smisson v. State, 71 Texas, 235, heretofore quoted from, replied: "The power to sell need not have been expressly granted by the Constitution; for in the absence of a prohibition the Legislature would have had that power, and, for this reason, we hold that the intention of the people, by the section of the Constitution under consideration, was to make the exercise of this power mandatory. The effect of this is to withdraw from the Legislature the power to adopt a system for the ultimate utilization of the common school lands otherwise than through sales; but as much was left to the discretion of the Legislature as to the time and terms on which sales should be made, we can not hold that it was thereby intended to withhold from the Legislature the power to temporarily utilize such lands in any manner deemed proper by the Legislature which would not, for a time at least, disable it to fully and freely exercise the power expressly granted.

"In the construction of constitutions, as well as of statutes, it has been often held that the powers necessary to the exercise of a power clearly granted will be implied; but we know of no case in which the express grant of a power legislative in its character has been held to carry with it an implied prohibition to exercise a power of that character, unless such implication is necessary to the full and free exercise of the power clearly given.

"As said by a distinguished elementary writer; when the power which is exercised is legislative in its character, the courts can enforce only those limitations which the Constitution imposes, and not those implied restrictions which, resting in theory only, the people have been satisfied to leave to the judgment, patriotism and sense of justice of their representatives. Cooley Const. Lim. (129).

"We think the Legislature of this State had the power to authorize such leasing of the lands referred to in section 4, article 7 of the Constitution, as will not interfere with the right of the State to sell them whenever the Legislature may deem this proper."

Since the construction placed upon section 4, article 7 of the Constitution, by Judge Stayton, it has been frequently held in this State that the Legislature has power to authorize the lease of the public lands.

It is not held in this case, nor would we be understood as holding, that the Legislature has power to dedicate any considerable portion of the public school lands to any purpose not in harmony with the constitutional provisions limiting its authority, but the effect of our holding is that for the purpose of facilitating the sale of such lands and immeasurably enhancing their value, the Legislature has the power to exercise the right of eminent domain confided to it by the people and forever reserved by it by implication, and for a public use, grant

an easement on any of said land for the purpose of public roads, right of way for railroads, telegraph and telephone companies and for dam and reservoir sites for empounding waters to be used for irrigation purposes and such other public utilities as a great public necessity demands. This we hold is nothing more than the exercise of that power which is inherent in the sovereign government and with which it never parts though it may dedicate, set apart and grant its lands; there is always an implied reservation of the power of eminent domain and while the title is held by the State the Legislature may power which is inherent in the sovereign government and with which exercise the power of such eminent domain without compensation in so far as such lands are to be affected. It grows out of necessity, and without the exercise of which society and governments could not exist. The exercise of this power as here contended for does not deprive the Legislature of its authority to sell the lands on which the easement is granted, for the title in the fee 'does not pass by the grant of the easement, and the property may be sold subject to such easement as in cases where public roads and railroad rights of way have been granted by the Legislature or by its authority.

It is not conceded but on the contrary is denied, that, by construing the Constitution as we do, any part of the public free school fund is in any manner diverted or authorized to be diverted, but on the contrary the way is open for an augmentation of that fund to such an extent as in comparison with the benefits received and to be received by the school fund the gift is infinitesimal. The construction of the Constitution here given is wholly in aid of the power of the Legislature to sell the public school lands for the best price and to the best advantage, and in no manner recognizes the authority to divert or misappropriate any portion of that fund.

Having made reference to the principle that the right of eminent domain is inherent in the Legislature and impliedly reserved in all dedications and grants, we desire to refer to some authorities on this subject. Mr. Lewis in his work on Eminent Domain, section 9, lays down this rule: "The eminent domain, as we have already seen, is a sovereign power and devolves upon those persons in a State who are clothed with the supreme authority. In the States of the American Union these persons are the people, or, more strictly, that portion of the people invested with the elective franchise. The power of eminent domain has been delegated by the people to the legislative department of the government in the general grant of legislative power."

"Whether the power of eminent domain shall be put in motion for any particular purpose, and whether the exigencies of the occasion and the public welfare require or justify its exercise, are questions which rest entirely with the Legislature. When the use is public, the necessity or expediency of appropriating any particular property is not a subject of judicial cognizance." (Lewis on Em. Domain, sec. 238.)

"Since all property is subject to the power of eminent domain, it matters not for what purpose it is held, nor how the title or use may be involved or restricted, nor what the estate or interest which any person has therein. The property of colleges or other educational institutions

and lands conveyed to trustees for an academy, are subject to the power." (Lewis on Em. Domain, 265.)

The principles here laid down are fully supported by Mr. Cooley in his work on Constitutional Limitations, pages 343, 648, 649.

In compliance with the holding herein it becomes the duty of this court to reverse the judgment of the Court of Civil Appeals rendered in this case and to affirm the judgment of the District Court, and it is accordingly so ordered.

MR. JUSTICE RAMSEY, concurring.

The importance of the questions involved in this case, and the fact of Chief Justice Brown's radical disagreement with the conclusion ·at which the majority of the court has arrived may excuse if it does not require a brief statement from me   No question in respect to which the Chief Justice expresses a settled conclusion at variance with the view decided can ever properly be said to be free from doubt, but from a very careful investigation of the matter here involved, in respect to which the difference arises, my best judgment strongly inclines me to the opinion so well expressed by Justice Dibrell.   I feel that I can add nothing to what he has so well said and ·therefore concur in and agree to his opinion.

MR. CHIEF JUSTICE BROWN, dissenting.

I regret that I am not able to agree with my associates in the disposition of this case.   I shall content myself with a brief statement of my views on the constitutional question which my brother, Dibrell, has so ably discussed.   His presentation of the provisions of the Constitution makes a strong argument in support of the conclusions reached by the majority of the court.   I believe, however, that taking the Constitution as a whole, and especially the provisions which directly apply to the free school fund of the State, it appears that the sovereign people of this State, in convention, devoted one-half of the public lands and the proceeds thereof to the public purpose of *free education*.   It is my opinion that this dedication by the people is paramount to any authority which may be implied in the Legislature from ·the fact that ordinarily the sovereign power of the people may be exercised by the legislative branch of the government.   I will quote and to the best of my ability apply the provisions of the Constitution which, in my judgment, show that the power to dispose of the school lands of the State was emphatically defined and limited in the provisions of that instrument.

The school fund of the State is defined thus: "All funds, lands and other property heretofore set apart and appropriated for the support of public schools; all the alternate sections of land reserved by the State out of grants heretofore made or that may hereafter be made to railroads, or other corporations, of any nature whatsoever; one-half of the public domain of the State; and all sums of money that may come to the State from the sale of any portion of the same, shall constitute a perpetual school fund." (Sec. 2 of art. 7, State Constitution.)

It is apparent that the lands which are sought to be appropriated by the Irrigation Company in this case in part belong to the school

fund of the State as defined above, and the next question that is pertinent to this controversy is, what authority had the Legislature over the school fund?

"The lands herein set apart to the public free school fund, *shall be sold* under such regulations, at such times, and on such terms as may be prescribed by law; and the Legislature shall not have power to grant any relief to purchasers thereof. The Comptroller shall invest the proceeds of such sales, and of those heretofore made, as he may be directed by the Board of Education herein provided for, in the bonds of the United States, the State of Texas, or counties in said State, or in such other securities and under such restrictions as may be prescribed by law; and the State shall be responsible for all investments." (Sec. 4 of art. 7, State Constitution.)

The following limitation is placed upon the power of the Legislature in the appropriation and disposition of the school fund, as before defined:

"The principal of all bonds and other funds, and the principal arising from the sale of the lands hereinbefore set apart for said school fund, shall be the permanent school fund; and all the interest derivable therefrom and the taxes herein authorized and levied shall be the available school fund, which shall be applied annually to the support of the public free schools. And no law shall ever be enacted appropriating any part of the permanent or available school fund to any other purpose whatever; nor shall the same or any part thereof ever be appropriated to or used for the support of any sectarian school; and the available school fund herein provided shall be distributed to the several counties according to their scholastic population and applied in manner as may be provided by law." (Sec. 5 of. art. 7, State Constitution.)

It is said that the school fund belongs to the State of Texas just the same as it did before the adoption of this Constitution. That is true, but the sovereign people in convention by their delegates had the authority and by these provisions did direct and command the Legislature to use that school fund for a certain purpose and under certain limitations. The Legislature is subordinate in its powers to the provisions of the Constitution and had no power nor authority to do any act affecting the free school fund of the State which is prohibited by the Constitution. I agree that if these provisions of the Constitution are susceptible of the construction that the Legislature nevertheless had the authority to devote this fund to a different purpose from that to which the people had themselves devoted it, then the conclusion reached by the majority is right and I am wrong. I am unable to strengthen, by any argument that I can offer, the plain unequivocal provisions of the Constitution by which the Legislature is commanded to reduce the lands and other funds into cash and to make investment of that fund in certain securities which are named in the Constitution. What more forcible suggestion as to the limitation of the use of this fund when thus reduced can be offered than the terse language of the Constitution itself "and no law shall ever be enacted appropriating any part of the permanent or available school fund to any other purpose whatever; nor shall the same or any part thereof ever be appropriated to or used for the support of any sectarian school; and the available school fund

herein provided shall be distributed to the several counties according to their scholastic population and applied in manner as may be provided by law." For want of more forcible and logical language I submit this quotation as my argument upon that proposition.

The land sought to be appropriated by the Irrigation Company is a part of the permanent school fund of the State of Texas and was, as shown above, dedicated by the convention which framed the Constitution to the support of the public free schools and the emphatic prohibition against a diversion of this fund applies to the land as well as to the proceeds thereof. If the lands were sold and converted into money the proceeds could not be diverted to the purposes of irrigation and, if the proceeds could not be so diverted, how can it be that the land could be?

The emphatic language of the Constitution whereby the appropriation of any part of this fund to another purpose is forbidden, precludes both construction and implication. It is evident that the framers of our Constitution had in mind that there might be an attempt to appropriate this fund to some other use, as had previously been done in the sale of the bonds and the appropriation of that fund, and it was the purpose, forcibly and tersely expressed, that this injunction should be placed upon the Legislature to prohibit a repetition of such a diversion of the fund.

There is no direct grant of authority to the Legislature to appropriate the lands which belonged to the school fund to the use of irrigation and it must rest upon an implied power contained in the Constitution. "Implied powers are such as are necessary to carry into effect those which are expressly granted and which must therefore be presumed to have been within the intention of the legislative grant." City of Madison v. Daily, 58 Fed., 755; Words & Phrases, 4th volume.

Since there is no express power in the Constitution to make the grant, notwithstanding the prohibition, it must be rested upon a power implied, and there can be no implication of authority unless it arise out of the necessity to enable either the Legislature or the object of its donation to perform some act enjoined or to exercise some power conferred upon it by the Constitution itself. The Constitution imposes no duty upon irrigation companies, nor upon the Legislature with reference to them. It confers no authority upon irrigation companies to do any act whatever and therefore there can be no implication of a power to appropriate the lands herein which are forbidden by the Constitution to be appropriated to such purposes.

The Constitution of the State is the source from which all departments derive their authority, and the Supreme Court is no less a creature of the Constitution than the humblest court in the land, and its obligation to observe the provisions of that instrument and its limitations upon the powers of other departments and upon its own authority is as binding as upon any other department of the government. We are not at liberty to amend or enlarge the policy of the State by construction of the Constitution although the policy as defined and laid out in that instrument may seem to us to be too narrow and unfitted for the needs of the present day. Such conditions must

be remedied by the exercise of the sovereign power of this government, by the sovereign, the voters themselves.

The opinion of the majority is planted upon the case of Texas Central Ry. Co. v. Bowman, 97 Texas, 417, without which I know of no support for the conclusion of my brethren in the decision of this court.

The opinion in the Bowman case is one of the ablest of many strong opinions written by Mr. Justice Williams and is conclusive as to the case then in hand. I am ready to surrender my objections in this case if that is fairly authority here.

I call attention to the fact that Judge Williams did not refer in his opinion to section 5 of article 7 of the Constitution, which prohibits the enactment of any law by which any part of the school fund might be diverted to any other purpose. Now I am ready to admit that the reasoning of that opinion would justify the conclusion that the members of the constitutional convention did not intend to include the right of way used by railroads over the school lands of the State, because that would produce conflict between section 5 of article 7 and that portion of the Constitution which granted the right to the railroads to construct their lines from one part of the State to another, to the enjoyment of which the use of the right of way over the school lands was an absolute necessity, therefore, it was legitimate to conclude, as the learned judge did, that it was not intended by the convention to grant this important right of construction and at the same time to deny it the necessary thing to enable it to so construct the road. If there be any facts in this case which place it upon the same footing as the Bowman case, then I shall retract my disagreement and stand with my brethren in the construction that they have reached. I wish to eliminate all irrelevant matter from this discussion and therefore admit that the law in question is the fruit of legislative power which resides in the people, and I admit that the Legislature may exercise its legislative power in regard to all matters wherein it is not prohibited by the Constitution, either directly or by fair implication. But I must insist that when the people have reserved to themselves the power to do a thing, or have denied to the Legislature the authority so to do, then the power remains with the people and the Legislature can not exercise such forbidden authority.

Recurring to the case of Railroad v. Bowman, I wish to examine the foundation upon which it rests, and then ascertain if it is applicable to the facts of this case. The scope of every judicial opinion must be determined by the facts of the case in which it is rendered. In the Bowman case the facts were that in the exercise of the power granted to it the railroad company had constructed its railroad over and across a section of school land which was afterwards sold to Bowman. The Legislature had enacted a law which was in consonance with the constitutional provisions, and authorized the railroad to so construct its line over all lands belonging to the State, to which I agree with the qualification that the people are the State and the Legislature merely the agents to perform and execute the will of the people. After the construction of the road the State sold the school land to Bowman and he brought suit against the railroad company for its possession.

Judge Williams stated the issue in this form: "It is claimed that the Legislature is without power to grant such rights of way over school lands because of the provisions of the Constitution in the second section of article 7 that 'all the alternate sections of land, etc., shall constitute a perpetual school fund;' and in the fourth section of the same article that: 'That lands herein set apart to the public free school fund shall be sold under such regulations, at such times, and on such terms as may be prescribed by law." It is apparent from this statement of the issue that the question before the court was one of authority to be derived from the express provisions of the Constitution with regard to the railroads, as well as numerous other provisions which incidentally affected the construction of the clause then under consideration.

In this case it is claimed that an Act of the Legislature which authorized irrigation companies to appropriate public lands of the State of Texas empowered such corporations to appropriate the school lands also. The difference in the two cases lies in this that the power under which the Legislature enacted the law in question in the Bowman case arose out of the express grant of right to construct the railroad from point to point, while in the case now before us there is no mention of an irrigation company, or of the subject of irrigation in any part of the Constitution.

In the Bowman case the conclusion was legitimately reached from the language of the Constitution, that it was not intended, as we have said before, by the adoption of the clause under consideration, to deny to railroad companies the means whereby they could enjoy the power conferred upon them and perform the duties which they were required to assume. In this case there is nothing whatever in the Constitution conferring any power or imposing any duty upon irrigation companies, the performance of which required that they should occupy the public lands of the State, neither was there any authority conferred upon the Legislature nor any duty imposed upon it, with reference to the creation and control of irrigation corporations, the accomplishment of which required the use of public lands by such corporations.

In the Bowman case the court was treating of a subject which was perhaps the most prominent before the convention during its sitting; and it was elaborately provided for in the Constitution. I, therefore, repeat, that it was legitimate to conclude that the subject of the construction of railroads was in the minds of the members of the convention, and that it was not intended to embrace the grant to them in the prohibitory clause; there is not a sentence in the whole Constitution of the State of Texas from which the conclusion can be drawn that the members of the convention had in mind, at the time of the adoption of section 5, article 7, the subject of irrigation in any of its phases or that the members were in any way mindful of what might become necessary in regard to irrigation in the future.

The substance of the decision in the case of Railroad v. Bowman is that the many provisions of the Constitution with regard to the subject of railroads must be looked to in the interpretation of the provision requiring lands belonging to the school fund to be sold. Looking to all the provisions in the Constitution, from the bill of rights to the

last article and section thereof, there is not one syllable or word which would throw any light whatever upon the intention of the convention in the enactment of the prohibitory section under consideration with reference to irrigation as then existing or a possible future development. I feel confident of my position that the Bowman case does not announce any rule of construction that can possibly apply to the facts of this case and that there is no similarity or analogy whatever between the two cases, therefore, the Bowman case can not govern us in this.

If the Legislature had authority to enact the irrigation law it is, in my judgment, of doubtful validity, because of its lack of any definite provisions to govern in the appropriation of the land, but I shall not discuss that question.