LEDDY, J.
The Tyler Vulcanizing & Battery Company, a corporation, hereinafter referred to as the battery company, was engaged in business in the city of Tyler. It had executed two chattel mortgages, covering various items of personal property, to secure certain notes executed to the People’s State Bank of Tyler, hereinafter referred to as the bank. The battery company was unable to pay this and other indebtedness, and, after negotiations with the bank officers, agreed to turn over all of the personal property owned by it to the bank, in order that it might dispose of the same to satisfy the indebtedness secured by its mortgages. Mr. Brogan, acting for the bank, entered into negotiations with the Monsey Oil Company, hereinafter referred to as the oil company, a partnership composed of P. 0. Monsey and T. E. Swann, and, as a result thereof a contract was made by which the bank agreed to sell the property covered by said mortgages to the oil company, for the sum of $5,250 cash. A cheek for this amount was given by the oil company to T. B. Ramey, Jr., counsel for said company, which was deposited by him in the bank; the express condition of the sale being that said deposit was to be paid over to the bank by Mr. Ramey when it tendered a title to the property in question which was satisfactory to, and approved by, the said Ramey.
It appears without dispute that Mr. Ramey, as attorney for the oil company, from the beginning insisted that a title to the property involved be derived through foreclosure proceedings under the two mortgages held by the bank. The attorney for the bank acceded to this demand and instituted proper foreclosure proceedings. One of these mortgages was executed by the battery company on March 14, 1923, securing a note executed by said company to the bank aggregating $4,-412.60, upon which there was a balance due of $350. The other mortgage was executed by the battery company to the bank on the 1st day of May, 1925, and secured a note, which, together with principal, interest, and attorney’s fees, aggregated $4,276. Judgment was rendered foreclosing separately each of these mortgages, and directing that the property described in each mortgage be sold in satisfaction of the amount secured thereby. At the sale the bank bid in the property for $3,000. Upon being informed that the bank was the owner of the property under the foreclosure, Mr. Ramey, the attorney for the oil company, after investigation, ascertained *509 that the sheriff had sold all of the property-described in the two mortgages in a lump, instead of selling the property described in each mortgage separately, and thereupon requested the attorney for the bank to re-advertise and resell the property in compliance with the decree of foreclosure. Instead' of doing this, the attorney for the bank procured a written transfer from all of the stockholders and directors of the battery company, and insisted that this would give a good title to such chattels. Mr. Rainey declined to accept such title, and never at any time receded from his position that the foreclosure sale was irregular and that the property should be re-advertised and resold. He testified with reference to-his objection to the foreclosure proceedings as follows: “When the matter was taken up after the papers came into my office, my objection to the title with reference to that particular matter was that according -to the sheriff’s return on the order of sale, both mortgages had been foreclosed and the property sold under both of them in a lump instead of having the property covered by one mortgage and securing one indebtedness sold to satisfy that debt and the other mortgage covering another list of property sold to satisfy that debt. They were all lumped together and sold without discrimination and without distinction for a total sum of $3,000. I wasn’t present at the sale, and I asked Mr. Simpson if it were true that the property had been sold in a lump that way rather than each separately to satisfy each separate debt and he said he didn’t know; that he wasn’t there; that he would investigate it and see about that; but that he thought it was sold separately. And the matter rocked along that way for some time and I would probably see him on the street or something like that and ask him if he had seen about that and he said no, he hadn’t. Finally one day I saw the sheriff, Mr. Strange, and asked him if it had been sold separately, or in a lump and he said it had been sold in a lump all together, all the property without distinction. Then shortly after that I told Mr. Simpson what the sheriff had told me and I think he said he would investigate it or something and the matter rocked along in that shape for a while.”
Mr. Simpson, attorney for the bank, -on this point testified as follows:
“1 believe the only objection Mr. Ramey made all along was the manner in which that property toas sold under foreclosure. I think Mr. Ramey requested that that matter be corrected and cleared up and I told him I didn’t know how it was done, but that I would look into it and try to clear it up. I don’t know that Mr. Ramey said he thought it would be all right as soon as I got that cleared up. He always said he wanted to look into the sheriff’s return; that he sold it in bulk and ought to have sold it separately. My recollection is that I said I wasn’t there, and I asked if it wasn’t sold separately, and I said I would look into it. I never did malee any effort to correct that sheriff’s return or re-sell it under that order of sale and have it sold separately as Mr. Ramey suggested. I didn’t think it was necessary is the reason I didn’t do it.
“I did not take that procedure to make that correction and have the objection raised on that account obviated in that manner for the reason that I didn’t think it was necessary. I would say that is the reason I didn’t do anything more about that, because I personally didn’t think it was necesary. I told Mr. Ramey I thought the bank could pass a good title by virtue of the bill of sale. We did it three ways and either one of them was sufficient I told Mr. Ramey and he didn’t agree with me; at least he didn’t say ‘Yes’ or didn’t say ‘No.’ He never accepted it. Mr. Ramey was insisting on this foreclosure proceeding I think. This paper is the bill of sale that I got up along in March, Mr. Ramey didn’t request me to get this bill of sale up. I got that up on my own initiative to take any question out of the case. The first Mr. Ram-ey knew of it was when I showed it to him there one day in the corridor in the office building and I told him I had gotten it. It is dated March 23, 1926. It was a few days after that that I showed it to Mr. Ramey. # ⅜ ‡ ))
At the close of the evidence the trial court concluded that the undisputed evidence showed a failure on the part of the bank to comply with the terms of its contract of sale, and instructed a verdict in favor of the oil company and Ramey for the amount of the deposit made to cover the purchase price of the property; it being shown that the bank had refused to honor Mr. Ramey’s check for the amount of this deposit. The correctness of the action of the trial court in giving the peremptory instruction is the only question presented for our determination.
There being no dispute in the evidence that the title to the chattels in question should be satisfactory to and approved by Mr. Ram-ey, the attorney for the oil company, the burden was upon the bank to plead and prove, not merely that it had furnished a good title to said property, but that the action of the attorney in rejecting or refusing to accept the title was arbitrary or in bad faith. City of Amarillo v. W. L. Slayton & Co. (Tex. Civ. App.) 208 S. W. 967; Stephens v. Kansas City Life Ins. Co. (Tex. Civ. App.) 233 S. W. 353; Davis v. Tate (Tex. Civ. App.) 242 S. W. 761; City of San Antonio v. Rollins (Tex. Civ. App.) 127 S. W. 1166; Grant v. City of Mineral Wells (Tex. Civ. App.) 230 S. W. 854; Blomstrom v. Wells (Tex. Civ. App.) 239 S. W. 227; Giles v. Union Land Co. (Tex. Civ. App.) 196 S. W. 312; Atwood v. Fagan, 63 Tex. Civ. App. 659, 134 S. W. 765; Greer v. Internation *510 al Stock Yards Co., 43 Tex. Civ. App. 370, 96 S. W. 79.
The bank did not plead that Ramey’s final rejection of the title, was arbitrary or in bad faith. The allegation on this point was that after the foreclosure Mr. Ramey made a further eccentric demand, and, in order to meet • such demand, the attorney for the bank obtained a written transfer to the property in question from the stockholders and directors of the battery company. We are of the opinion an averment that an' attorney made an eccentric demand in passing upon title to property is not equivalent to an allegation that he acted either arbitrarily or in bad faith. It is simply an allegation that the demand was out of the ordinary, peculiar, or unusual. It is a matter of common knowledge that many such demands, which might be termed eccentric, are made by attorneys in perfect good faith, and in no sense could be said to be arbitrary.
It is not necessary, however, to rest our decision upon the insufficiency of the pleading in the respect indicated, as we think the record conclusively shows that the objection made by Mr. Ramey to the title to these chattels was not only not arbitrary or made in bad faith, but was, as a matter of law, a valid and legal one. In other words, we think the undisputed evidence disclosed that the title tendered by the bank to the oil company did not appear to be good.
The undisputed evidence showed that the battery company was insolvent. Being insolvent, its oral and written transfer to the bank of property admittedly of a value in excess of the bank’s indebtedness was fairly subject to attack by other creditors. In National Bank v. Texas Investment Co., 74 Tex. 421, 12 S. W. 101, the court, in discussing a similar question, said: “But when one corporation transfers all its assets to another corporation and thus practically ceases to exist, without having paid its debts, the latter corporation takes the property subject to a lien in favor of the creditors of the old company. This doctrine is distinctly asserted in 1 Jones on Liens, Sec. 85, et seq., and is supported by the following cases: Brum v. Ins. Co. [C. C.] 16 F. 140; Hibernia Ins. C.o. v. Transportation Company [C. C.] 13 F. 516; Harrison v. Ry. Co. [C. C.] 13 F. 522; Henson [Herman] v. Britton, 88 Mo. 549; Blair v. Ry. Co. [C. C.] 24 F. 148; Fogg v. Ry. Co. [C. C.] 17 F. 871.”
In view of the corporation’s insolvency, it could not transfer more of its property to a lien creditor than was reasonably sufficient to satisfy the indebtedness held by such creditor. La Belle Wagon-Works v. Tidball, 69 Tex. 161, 6 S. W. 672; Coughran v. Edmondson, 106 Tex. 540, 172 S. W. 1106. The remainder of its property was a trust fund in which all unsecured creditors were entitled to share. Galvin v. McConnell, 53 Tex. Civ. App. 486, 117 S. W. 211; Gen. Elec. Co. v. Canyon City Ice & Light Co. (Tex. Civ. App.) 136 S. W. 78.
No title having been offered by the oral and written transfer which was not legally subject to attack by other creditors, the question arises: Was a good title tendered under the mortgage foreclosure? We think the fact that the sheriff sold the property covered by separate and distinct mortgages in the aggregate to satisfy the full amount of the judgment, instead of selling the separate list of property described in each mortgage in satisfaction of the amount due thereunder, was illegal and reasonably calculated to involve the oil company in litigation with other creditors of the battery company. As a general rule, a mortgagee has no right to apply the surplus proceeds of a foreclosure to other debts or claims which he holds against the mortgagor; he has no priority over other geheral creditors of the mortgagor. 27 Cyc. 1770; Dale v. McEvers, 2 Cow. (N. Y.) 118; Jones v. Lackland, 2 Grat. (Va.) 81; Johnson V. Harrison, 41 Wis. 381.
An officer, in making a sale under foreclosure, derives his power from the ⅝ decree; hence the same must be exercised strictly in accordance therewith. The effect of selling property covered by both mortgages in the aggregate instead of separately was to enlarge and extend the lien of the mortgage given in 1925 to the property covered by the mortgage given in 1923. The 1923 mortgage secured an indebtedness of only $350, and the creditors of said corporation were entitled to the excess that any. property in the 1923 mortgage not covered by the 1925' mortgage brought above the amount secured thereby. The surplus of such a sale represented the equity of redemption and belonged to the mortgagor. Because of the insolvency of the corporation, it was a trust fund for unsecured creditors. Norris v. Graham (Tex. Civ. App.) 42 S. W. 575; Bettis v. Townsend, 61 Cal. 333; Hamilton County v. State, 122 Ind. 333, 24 N. E. 347; Ryan v. Sugg, 61 S. W. 702, 22 Ky. Law Rep, 1798; 27 Cyc. 1767. An inspection of the lists of property in the two mortgages shows that the 1923 mortgage describes various articles that are not contained in the 1925 mortgage, such items aggregating in value a sum in excess of $1,200.
If the court’s decree of foreclosure had ordered the property described in both mortgages sold in the aggregate to satisfy the full amount of the judgment, it would have been erroneous. In the case of Home Loan Association v. Wilkins, 66 Cal. 9, 4 P. 697, the court, in so holding, said: “This action was brought to foreclose two mortgages, each of which was on a separate and distinct parcel of property. The decree is for the sale of both parcels to satisfy the aggregate sum due on both mortgages. In that regard the decree is erroneous. Each parcel should be sold to satisfy the sum for which it was *511 separately mortgaged. Cause remanded with directions that the decree he modified as above suggested.”
If the court could not legally provide for such a sale in its decree, it logically follows that the officer could not sell the property in such manner, and this is especially true when' it appears that such sale was in violation of the specific terms of the decree.
It is true Mr. Brogan testified that the 1925 mortgage covered all the property which the bank was selling to the. oil company and all of the property described in the 1923 mortgage which had not been sold or disposed of when the last mortgage was executed. There is, however, no evidence showing that Mr. Ramey was so informed, or that from any source he had any knowledge of such fact. So far as the record is concerned, the list of property shown in the mortgages was all that he had by which to determine the validity of the foreclosure proceedings, and, in the absence of information to the contrary, he had the right to assume the property sold was the same as described in the petition for and the judgment of foreclosure. The question of the validity of Mr. Ramey’s objection must be determined in the light of the facts that were known by him at the time such objection was made. There is no testimony to the effect that he knew or was informed by any one that the 1925 mortgage covered all the property being sold to the oil company, or that he had any knowledge that the property sold under foreclosure was not the particular articles described in the two mortgages, as the same was set forth in the petition for foreclosure.
Counsel for the bank strenuously urge the legal proposition that the oil company having repudiated the contract solely on account of its failure to get a lease on the premises formerly occupied by the battery company, the bank was thereby relieved of the necessity of complying with its contract to tender the oil company a good title. We have no fault to find with the legal proposition asserted, but are unable to agree that it is applicable to the facts of this case, for the reason that the evidence conclusively shows that the objection made by Mr. Ramey in regard to the irregularity of the sale under foreclosure was made before any question in regard to the lease became involved, and it is further shown that he never at any time receded from or waived the objection so made. It is true he testified upon the trial that he had two reasons for declining the title. Upon being asked in regard to his letter notifying the bank of its failure to comply with the contract, he stated: “One reason I wrote that was because they had served notice on him to vacate. There was two reasons. One was because they never had tendered a good title, and the other because Mr. Monsey and Mr. Swann told me that the sale had been contingent upon the lease.” If the objection made to the title tendered by the bank was valid and legal and not waived, it would be wholly immaterial how many other and additional undisclosed reasons the attorney had for declining to accept the title. Conlin v. Osborn, 161 Cal. 659, 120 P. 755; New Publication Co. v. Stern (N. Y. Sup.) 127 N. Y. S. 393.
The undisputed evidence shows that the attorney for the bank declined to do anything further to meet a legal and valid objection made by the oil company’s attorney. The bank would not be in a position to complain in this respect until i't had met such objection to the title. Moreover, it is not shown that Mr. Ramey ever communicated to the bank or its attorney any such reason for declining the title. It appears that during the negotiations the only ground upon which he declined to accept the title is that they had not furnished an acceptable title under the foreclosure proceedings, and in none of the negotiations is it shown that he ever asserted that he would decline to approve the title unless his client procured the lease on the premises formerly occupied by the battery company. The first time Mr. Ramey made any assertion in favor of his clients in regard to the lease was that contained in his testimony given upon the trial of this case.
It is also urged that the peremptory instruction was improper for the reason that the bank had not been allowed a reasonable time within which to furnish a good title to said property to the oil company. This contention is completely answered by the fact that no such issue was pleaded in the court below. In fact, the ease was tried on an altogether different theory. There was no contention made upon the trial, either by pleading or proof, that the bank had not been afforded a reasonable time to furnish a good title. On the contrary, it was affirmatively pleaded, and attempted to be supported by proof, that it had in fact done all that was necessary to furnish a good and merchantable title under its contract. Having tried the case on this theory, its right is foreclosed on appeal to assume an inconsistent position by urging that it was not allowed a reasonable time within which to furnish a good title to the property in question. N. Y., L. E. & W. Railway Co. v. Estill, 147 U. S. 591, 13 S. Ct. 444, 37 L. Ed. 292; Illinois Central Ry. Co. v. Egan (C. C. A.) 203 F. 937; Lesser Cotton Co. v. Railway Co., 114 F. 133, 52 C. C. A. 95.
We think the peremptory instruction was demanded under the undisputed facts, and therefore recommend that the judgment of the Court of Civil Appeals be affirmed.
GREENWOOD and PIERSON, JJ. Judgments of the district court and Court of Civil Appeals affirmed.