JESSE H. BENNETT ET UX V.
BROWN COUNTY WATER IMPROVEMENT DISTRICT NO. ONE

No. A-4415. Decided July 21, 1954.
Rehearing overruled December 1, 1954.
(272 S.W. 2d Series 498)

*Mark Callaway,* of Brownwood, for petitioners.

The Court of Civil Appeals erred in holding that the respondent water district was a political subdivision of the State and in the operation of said irrigation ditch was performing a governmental function and stands on the same footing as a county, and was acting as such agency for public use. City of Amarillo v. Ware, 120 Texas, 456, 40 S.W. 2d 57; Ostrom v. City of San Antonio, 94 Texas 523, 62 S.W. 909; City of Dallas v. Higginbotham, 135 Texas 158, 143 S.W. 2d 79.

*J. C. Darroch,* of Brownwood, for respondent.

MR. JUSTICE GRIFFIN delivered the opinion of the Court.

Norman Eugene Bennett, eight-year-old son of petitioners, was drowned when he fell into an irrigation ditch owned and operated by respondent as a part of the function of storing and distributing flood waters in Brown County, Texas. Petitioners filed suit for damages against respondent alleging that respondent was guilty of negligence in the construction and operation of the irrigation ditch at the place where young Bennett was drowned; that such ditch and the water therein at the place where the regrettable accident occurred constituted an "attractive nuisance" to one of the tender years of young Bennett; and that the respondent was guilty of maintaining a nuisance at the time and place in question. Respondent filed a motion to dismiss the petition on the ground that the plaintiff's petition showed respondent at the time and place in question to be a governmental agency engaged in carrying out the public rights and duties imposed upon it by law and for which it was created. The trial court sustained the motion to dismiss and the Bennetts declined to amend, and appealed to the Court of Civil Appeals. In the Court of Civil Appeals the judgment of the trial court was affirmed. 261 S.W. 2d 754.

Upon the trial the following agreement was made between the parties to this litigation, in open court acting through their respective attorneys:

"Brown County Water District owns Lake Brownwood, which is the reservoir for impounding water that the District dispenses to the inhabitants of the District and to the City of Brownwood. This reservoir was created by virtue of issuance of bonds of the District, together with the irrigation canal and the laterals taking off from it; it wholesales to the City of Brownwood and dispenses water to the irrigated lands within the District. On the date of the death of the Bennett child, Brown County Water Improvement District owned and was operating the canal and the syphon at which the death of the child took place; and it is admitted that water was flowing through that irrigation canal at that time, and the water was being flowed through that canal for the purposes for which the District was created. It is further admitted that this canal was constructed in accordance with the plans of—in accordance with the plans and specifications of reputable engineers, and under a contract approved by the Brown County Water Improvement District's board of directors, acting upon the advice and under the direction of such engineers."

Respondent was created under the provisions of Article XVI, Section 59a of our State Constitution, and statutes enacted thereunder by the Legislature to carry into effect such constitutional provision.

Section 59a of Article XVI provides, in part, that the conservation and development of all the natural resources of this state, including the control, storing, preservation and distribution of its storm and flood waters, the waters of its rivers and streams for irrigation and all other useful purposes, the reclamation and irrigation of its arid, semi-arid and other lands needing irrigation, the reclamation and drainage of its overflowed lands, and other land needing drainage, and the preservation and conservation of all such natural resources of the state are each and all hereby declared public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto. Subsection (b) of such Section 59 provides, in part, for the creation of conservation and reclamation districts as may be determined essential to the accomplishment of this (conservation) amendment, "which districts shall be governmental agencies and bodies politic and corporate with such powers of government and with authority to exercise such rights, privileges, and functions concerning the subject matter of this amendment as may be conferred by law." Article 7731, Vernon's Annotated Texas Civ. Stat. (Ch. 13, Sec. 6, Acts, Reg. Ses., 37th Leg., 1921) with regard to the water improvement districts provides in part,

"All such districts shall be governmental agencies, and body politic and corporate, and be governed by and exercise all the rights, privileges and powers provided by law * * *."

Petitioners admit that this district is "a governmental agency and a body politic," but contend that the liability of the district is analagous to that of a city; i.e., it is liable for the negligence of its agents and servants resulting in the exercise of proprietary functions as distinguished from governmental functions. Petitioners further contend that the furnishing of water for irrigation purposes to the inhabitants of the District is a proprietary and not a governmental function. We think this matter has been foreclosed by previous decision of this Court, both by this Court's opinion, and by our "refusal" of application for writ of error (since 1927) in two cases from the Courts of Civil Appeals.

In the case of Willacy County Water Control and Improvement Dist. No. 1, et al v. Abendroth (1944), 142 Texas 320, 177 S.W. 2d 936, 937, Abendroth sought to make the District subject to a writ of garnishment in his favor. The trial court sustained exceptions to the writ upon the grounds that the District was exempt from garnishment by reason of being a body corporate and politic and a political subdivision of the State of Texas. On appeal the Court of Civil Appeals (175 S.W. 2d 90) reversed upon the grounds that the District was a "body corporate and politic * * *," only in the sense that a city was a "body corporate and politic," and therefore subject to garnishment under the same rule of law as a city. Cities were held to be subject to garnishment in the absence of a statute exempting them. Since there was no statute exempting water improvement districts, the Court of Civil Appeals held the District to be subject to garnishment. Thus, there was squarely presented to this Court the question of whether or not a water improvement district was a "body corporate and politic" only as a city. This court, after discussing Article XVI, Section 59a of our Constitution, an act of the 41st Legislature (1929, Vernon's Anno. Civ. Stat., Art. 7880-147c) validating such districts and again declaring these districts to be "valid and existing governmental agencies, and bodies politic," and the necessity for a specific statutory enactment to make counties, school districts, etc., subject to garnishment, said:

"Irrigation districts, navigation districts, levee and improvement districts, and like political subdivisions created under Secton 59a of Article XVI of the Constitution, and statutes enacted

thereunder carrying out the purposes of such constitutional provision, are not classed with municipal corporations, but are held to be political subdivisions of the State, performing governmental functions, and standing upon the same footing as counties and other political subdivisions established by law. Harris County Flood Control District v. Mann, 135 Texas 239, 140 S.W. 2d 1098; Wharton County Drainage District No. 1 et al v. Higbee et al, Texas Civ. App., 149 S.W. 381, writ refused; Bexar-Medina-Atascosa Counties Water Improvement District No. 1 v. State, Texas Civ. App., 21 S.W. 2d 747, writ refused; Engelman Land Co. et al v. Donna Irrigation District No. 1 et al, Texas Civ. App., 209 S.W. 428, writ refused; Arneson v. Shary et al, Texas Civ. App., 32 S.W. 2d 907, appeal dismissed, Arneson v. United Irr. Co., 284 U.S. 592, 52 S. Ct. 202, 76 L. Ed. 510; Harris County Drainage District No. 12 v. City of Houston, Texas Com. App., 35 S.W. 2d 118, 120; 44 Texas Jur., p. 262, Sec. 176."

This Court gave an unqualified "refusal" to the opinion of the Court of Civil Appeals in the case of Jones v. Jefferson County Drainage Dist. No. 6, (1940) 139 S.W. 2d 861, wherein it was sought to hold the Drainage District liable for injury to plaintiff by virtue of negligence of a District employee. A demurrer was sustained to the plaintiff's petition by the trial court. In affirming the judgment, the Court of Civil Appeals said:

"Drainage districts created under the provisions of Chapter 7 of Title 128, Art. 8097, V.C.S., enacted under authority of Art. 16, Sec. 59a, of the State Constitution, Vernon's Ann. St., are political subdivisions of the state of the same nature and stand upon exactly the same footing as counties, or precincts, or any of the other political subdivisions of the state. Harris County Drainage District No. 12 v. City of Houston, Texas Com. App., 35 S.W. 2d 118; Wharton County Drainage District No. 1 v. Higbee, Texas Civ. App., 149 S.W. 381; American Surety Co. v. Hidalgo County, Texas Civ. App., 283 S.W. 267, writ of error refused; Parker v. Harris County Drainage District, Texas Civ. App., 148 S.W. 351; Harris County v. Gerhart, 115 Texas 449, 283 S.W. 139; Nussbaum v. Bell County, 97 Texas 86, 76 S.W. 430; Braun v. Trustees of Victoria Independent School District, Texas Civ. App., 114 S.W. 2d 947; 15 Texas Jur. 722.

"In the Gerhart case, supra, our Supreme Court held (115 Texas 449, 283 S.W. 140): 'It is well established that at common law counties as a rule are not liable for injuries resulting from the negligence of their officers or agents, and no recovery can be had in damages unless liability be created by statute.

Heigel v. Wichita County, 84 Texas 392, 19 S.W. 562, 31 Am. St. Rep. 63; Nussbaum v. Bell County, 97 Texas 86, 76 S.W. 430'.

"Since drainage districts are of the same nature and stand upon the same footing as counties, and since counties are not liable for injuries resulting from the negligence of their officers or agents, it logically follows that drainage districts, likewise, are not liable for injuries resulting from the negligence of their officers or agents."

A holding to the same effect is the case of Peters v. Matagorda County Drainage Dist. No. 1 (1941), 146 S.W. 2d 779. One of the contentions of appellant therein was that this Court, by its "refusal" of the application for writ of error in the Jones case, supra, did not give its approval to the proposition of law that drainage districts were of the same nature and stand upon the same footing as counties, and therefore are not liable for injuries resulting from the negligence of their officers or agents. This contention was set out in the Court of Civil Appeals' opinion and was specifically overruled. This Court unqualifiedly "refused" an application for writ of error in the case.

It is contended that the above drainage district cases are not authority in this case because a drainage district is partly organized under the police power of the State for the protection of the health and property of its inhabitants. Drainage districts receive their vitality from the same amendment (Section 59, Art. 16, and the public welfare, health and well being is served by a water conservation district the same as by a drainage district.

For an enlightening discussion of the law applicable to causes such as the one at bar see the case of Hodge v. Lower Colorado River Authority (1942), Texas Civ. App., 163 S.W. 2d 855, writ dismissed by agreement of the parties.

The following cases thoroughly discuss the nature and characteristics of the Lower Colorado River Authority, which has been created under Article XVI, Section 59a, and hold that such Authority is a governmental agency, a body politic and possessed of the characteristics and nature as the State and its governmental subdivisions. Such cases also hold that the Authority does not lose its governmental character by virtue of the fact that it generates power and sells the power to individuals, the same as a private utility. Lower Colorado River Authority v. McGraw, 125 Texas 268, 83 S.W. 2d 629; Lower

Colorado River Authority v. Chemical Bank & Trust Co., Texas Civ. App., 185 S.W. 2d 461, affirmed 144 Texas 326, 190 S.W. 2d 48. We can see no distinction in the rules of law to be applied to either a drainage district or the Lower Colorado River Authority, or to respondent herein. Each is created under the authority of Article XVI, Section 59, and the appropriate legislative enactments. The people of Texas, in adopting the Conservation Amendment (Article XVI, Section 59) have very plainly set forth that they decree these districts to be "governmental agencies and bodies politic." The representatives of the people assembled in the Legislature, in carrying into effect the constitutional amendment, have likewise so decreed. It is the duty of the courts to give effect to the will of the people as so plainly expressed.

Petitioners seek to impose liability under the cases of Hidalgo County Improvement Dist. No. 2 v. Holderbaum, Texas Com. App., 11 S.W. 2d 506 and the City of Amarillo v. Ware, 120 Texas 456, 40 S.W. 2d 57, and the authorities therein cited. Liability in those cases was predicated, first, upon the fact that the injury sustained was property damage; and, second, that the city was engaged in a proprietary function at the time of inflction of the injury. The commission of Appeals in the Holderbaum case, supra (11 S.W. 2d 507), bases the liability of the water improvement district upon the " 'damaging or destruction' " of Holderbaum's property by virtue of the flooding and seepage from the district's ditches and canals. The opinion states "* * * The 'district,' whatever its degree as a public or governmental agency (Section 59, Art. 16, Constitution), has no immunity from liability for injuries referred to in Section 17, Art. 1." (State Constitution). The last mentioned section is the one that prohibits the "taking, damaging or destruction" of one's property by the State, or by state authority without payment of adequate compensation. Judge Nickels expressly states that the "exact character of the 'district' is a matter not essential of the case presently made." In the case at bar, the district is a governmental agency and body politic, and governed by the law applicable to counties. A county is liable only under statutory enactment, and there being no statute making the district liable in a case such as this, no liability can result. Also, the Constitution, Article I, Section 17, specifically makes all governmental agencies liable for taking of, or damage to, or destruction of property. Here no property damage is claimed.

Petitioners cite the case of City of Ysleta v. Babbitt, 1894, 8 Texas Civ. App. 432, 28 S.W. 702, no writ history, as authority for holding the respondent liable in this case. That case in-

volved the liability of a city by virtue of its operation of an irrigation system some 23 years prior to the adoption of the Conservation Amendment to our State Constitution by vote of the people of Texas in 1917, and the enabling statutes passed by the people's representatives assembled in the Legislative Session of 1917. Also in the Ysleta case, the city had, by common consent, taken over the operation of the irrigation system that had existed for many years prior thereto. Again, liability was sought to be established in that case for failure to furnish water (which it was alleged was available) to plaintiff to enable him to make a crop. Plaintiff was entitled to receive his needed water under an implied contract, as it were, with the city to permit him to continue to use necessary water for the crop year 1892, as he had been using water in the past. In any event, this case cannot be authority that a water improvement district organized under Article XVI, Section 59, is not a body politic and governmental agency.

Petitioners also cite and rely upon such cases as Raywood Rice Canal & Milling Co. v. Erp, (1912), 105 Texas 161, 146 S.W. 155; American Rio Grande Land & Irrigation Co. v. Mercedes Plantation Co. Com. App., (1919) 208 S.W. 904; Edinburg Irr. Co. v. Ledbetter, Com. App., (1926) 286 S.W. 185; Markham Irr. Co. v. Brown, Com. App., (1927) 292 S.W. 863; Garwood Irr. Co. v. Williams, Texas Civ. App., (1951) 243 S.W. 2d 453, n.r.e., and Richman v. Calhoun County Canal Company, Texas Civ. App., (1954) 264 S.W. 2d 738, n. r. e., as authority for liability of respondent district in this cause. The first two of the above cases involved matters arising prior to 1917, the date of the adoption of the conservation amendment. All of the cases involved private irrigation companies, and corporations organized under appropriate subdivisions of Article 1302, Vernon's Annotated Texas Civil Statutes. All were suits for breach of a contract duty, and also statutory duty under what is now Article 7557, Vernon's Annotated Texas Civil Statutes, to furnish water pro-rata to all users served by any irrigation system. Not one of those irrigation companies was a water conservation and improvement district as is respondent. It is contented that there should be no distinction as to liability between private irrigation corporations and water conservation and improvement districts. Regardless of what our individual opinion upon that question may be, it is our duty to obey the mandate of the people of Texas when they have spoken so clearly in the adoption of Section 59, Article XVI of our present Constitution. Our government is one in which the people are the sole respository of all power. They are limited only and solely

as they have delegated their powers to the various branches of the State government. The people had the right to declare organizations such as respondent to be bodies politic and governmental bodies. This they have done in no uncertain terms. Private irrigation companies can issue no bonds, levy no taxes, and in many other ways differ from water conservation districts.

The importance of water and soil conservation to a state and all of its inhabitants is forcibly demonstrated by the facts of history. Whole civilizations, nations and peoples have perished where the water supply has failed. Surely, the people of Texas were only using good judgment and giving effect to that "self-preservation" which is the first law of nature when they adopted Section 59, Article XVI of our Constitution and their representatives in the Legislature adopted Article 7731 of our Revised Civil Statutes.

Judge Fly, in his usual inimitable and lucid style, has set forth in the case of Bexar-Medina-Atascosa Counties Water Improvement District No. 1 v. State, Texas Civ. App., 21 S.W. 2d 747, writ refused, the reason which prompted the citizens of Texas to confer governmental powers and exemptions upon districts such as respondent.

Petitioners' pleadings, seeking to establish liability on the grounds of a nuisance, are clearly contrary to the rule of law declared by Chief Justice Alexander in the case of Gotcher v. City of Farmersville, 137 Texas 12, 151 S.W. 2d 565 (2), 566, wherein it is said:

"There are authorities which hold that a municipality is liable for damages caused by the maintenance of a nuisance, even though the municipality in maintaining the same is engaged in the exercise of a governmental function. 43 C. J. 956; 30 Texas. Jur. 537. However, in order to create liability for the maintenance of a nuisance, the nuisance must in some way constitute an unlawful invasion of the rights of others. 46 C. J. p. 653, sec. 18."

The judgments of both courts below are in all things affirmed.

Opinion delivered July 21, 1954.

### DISSENTING OPINION

MR. JUSTICE WILSON, JOINED BY JUSTICES CALVERT AND SMITH, dissenting.

I respectfully dissent and will write at some length because (1) as government expands into fields also performed by private enterprise, it should assume the same liabilities as private enterprise, (2) the majority opinion tends toward centralization of government, and (3) it is contrary to the weight of authority throughout the United States.

Exemption from tort liability is here accorded to a water improvement district, as a subdivision of the central state government, because:

1.   Sect. 59a, Art. XVI, Texas Constitution, provides that conservation, storage and distribution of water is a public right and duty.

2.   Sec. 59b, Art. XVI, Texas Constitution, and Art. 7731, V.A.C.S., declare that districts shall be governmental agencies and bodies politic and corporate.

3.   Stare decisis. The majority holds here that a water improvement district is a subdivision of the state comparable to a county and not comparable to a city, citing Willacy County Water Control & Improvement Dist. No. 1 v. Abendroth, 142 Texas 320, 177 S.W. 2d 936; Jones v. Jefferson County Drainage Dist. No. 6, Texas Civ. App., 139 S.W. 2d 861; The Lower Colorado River Authority cases reported at 125 Texas 268, 83 S.W. 2d 629 and Texas Civ. App. 185, SW. 2d 461; (also 144 Texas 326, 190 S.W. 2d 48) and Bexar-Medina-Atascosa Counties Water Improvement Dist. No. 1 v. State, Texas Civ. App. 21 S.W. 2d 747.

The basis of this dissent is that:

(1) The maintenance and operation of irrigation canals is a proprietary and not a governmental function.

(2) It is immaterial whether a water improvement district be comparable to a city or to a county since even a county should be liable for torts committed while performing a proprietary function.

(3) Even if a county be held to be not liable for torts committed while performing a proprietary function, still a water improvement district is more comparable to a city than to a county because it is created voluntarily by its inhabitants for their own advancement.

The majority opinion holds in the following language that the maintenance and operation of an irrigation canal is a governmental and not a proprietary function:

"Petitioners further contend that the furnishing of water for irrigation purposes to the inhabitants of the District is a proprietary and not a governmental function. We think this matter has been foreclosed by previous decision of this court, both by this court's opinion, and by our 'refusal' of application for writ of error (since 1927) in two cases from the Courts of Civil Appeals."

In the case at bar the plantiff alleges that the water passing through the conduit where their son was drowned was solely used for sale to land owners at profit to the District and for the benefit of the land owners. The district receives its revenue from ad valorem taxes and from service charges. There was a charge to the landowner for the water of a flat rate of One Dollar and Twenty-five Cents per acre of land subject to irrigation and an additional charge of ninety cents per acre for land actually irrigated.

The privilege and duty to develop, conserve, and distribute water for irrigation purposes can, is, and has for a great many years been carried on in Texas by both private and municipal corporations. Art. 7547, V.A.C.S. This includes the sale of water for irrigation purposes. City of Ysleta v. Babbitt, 8 Texas Civ. App. 432, 28 S.W. 702. Private corporations are authorized to perform these functions by Art. 1302, V.A.C.S., which provides as follows:

"The purposes for which private corporations may be formed are:
"32. To construct, maintain and operate canals, ditches, flumes, feeders, laterals, dams, reservoirs, lakes and wells, and for conserving, storing, conducting and transferring water to all persons entitled to the use of the same for irrigation, mining, milling, manufacturing, the development of power to cities and towns for waterworks, and for stock-raising. Acts 1917, p. 224.
* * *
"88. Private corporations may be created for, or, after being created, may so amend their charters as to include two or more of the following purposes, namely: The supply of water to the public for irrigation, power, municipal or domestic purposes; * * *"

How can the operation of an irrigation system be purely governmental if it is legally performed for profit by private corporations? The courts of Texas have treated irrigation companies as a sort of public utility and there is a great deal of

both case and statute law defining their status. In Raywood Rice Canal & Milling Co. v. Erp, 105 Texas 161, 146 S.W. 155, 158, this courts said:

"The granting of the power of eminent domain imposes a public service in return. No authority under our law exists for conferring the power of eminent domain for private use. The moment such power is granted, the grantee becomes quasi public in character, and while his or its functions are exercised for profit, they must be exercised in the interest of the public upon reasonable terms and without discrimination. * * *"

In American Rio Grande Land and Irrigation Co. v. Mercedes Plantation Co., (Com. App. 1919) 208 S.W. 904, 905, this court said:

"Defendant corporation was organized under and in virtue of article 5002, Rev. St. 1911, (Vernon's Civ. Stat. Art. 1526, Corporations; and Article 7552, Water), as an irrigation corporation. It is well settled in this state that a corporation organized under the irrigation act is a quasi public corporation, charged with certain duties to the public by reason of the powers and privileges conferred upon it by the statutes pertaining to irrigation. Borden v. (Trespalacios) Rice & Irrigation Co., 98 Texas 494, 86 S.W. 11, 107 Am. St. Rep. 640; Imperial Irrigation Co. v. Jayne, 104 Texas 395, 138 S.W. 575, Ann. Cas. 1914B, 322; Raywood Rice, Canal & Milling Co. v. Erp, 105 Texas 161, 146 S.W. 155."

In holding that the maintenance of an irrigation canal is a governmental and not a corporate or proprietary function, the majority opinion ignores the statutes and the cases cited above.[1]

The structural difference between a county and a city is not a simple matter. Their differences are more historical than logical and cannot be rightly understood except against their historical background.

The words "subdivision of the state" and "body politic and corporate" are not trustworthy criteria by which to differentiate between a county and a city. Texas modeled its county government upon that of Virginia, which in turn came from England during the colonial period. Our city government came from the

---

1. See also Edinburg Irr. Co. v. Ledbetter, Texas Com. App. 286 S.W. 185; Markham Irr. Co. v. Brown, Texas Com. App. 292 S.W. 863; Garwood Irr. Co. v. Williams, CCA, 243 S.W. 2d 453, n.re.

English borough. The concept of a legal entity (not subject to dissolution upon changes in its personnel as partnerships are) first emerged in England from the Universities and the boroughs. It then spread to what we now call private corporations (or business entities). The English counties and cities did not have uniform governmental structures, and neither are these units structurally the same throughout the United States. Each English county and each English city grew from local custom and the grants of separate franchises by the King. For this reason, it is very difficult to generalize about English governmental units during the American Colonial period.[2] However, we can say that many boroughs were more of a legal entity than were most counties. The municipal borough charter originated as a Royal franchise. In general, this type of Royal franchise was a grant of liberty and power and not an agency appointment. The liberty granted was often a release from payments or services due the King. Traditionally, in England, counties emerged as an incidence of land tenure and many of them originally took their name, area, and boundaries from the lands held by a Count. But the inclusion of a rural area is not an absolute test, for the borough often included extensive areas of cultivated land held in farm tenancy and the borough was also a form of tenancy for both rural and urban land. As the government of England was centralized, and as the powers of the nobility diminished, the county emerged as a local unit of the central government. In the course of time this change came, more often than not, to represent a flow of power downward from the King in the nature of agency. Although the borough also

---

2.—Pollock & Maitland, in writing of the structure of the English county at a very early time (before Edward I) says:

"The 'county' is not a mere stretch of land, a governmental district; it is an organized body of men; it is a *communitas*. We must stop short of saying that it is a corporation. The idea of a corporation is being evolved but slowly, and our shires never become corporations, so that in later days the term 'county corporate' is employed to distinguish certain municipal borough, which have been endowed with the organization of counties, from the ordinary shires or 'counties at large.' With such 'counties corporate' we have not to deal; they belong to another age. But attending only to the 'counties at large.' We notice that the law and the language of our period seem at first sight to treat them much as though they were corporations, and in this respect to draw no hard line between them and the chartered towns; the borough is a *communitas*, so is the county. It would even seem that under Edward I. the county of Devon had a common seal. This may have been an exceptional manifestation of unity; but John had granted to Cornwall and to Devonshire charters which in form differed little from those that he granted to boroughs:—if a grant of liberties might be made to the men of a town and their heirs, so also a grant of liberties, a grant of freedom from forestal exactions, a grant of the right to elect a sheriff, might be made to the men of a county and their heirs. But the county was apt to find its unity brought home to it in the form of liabilities rather than in the form of rights. The county was punished for the mistakes and misdoings of its assembly, the county court." *History of English Law*, p. 534.

derived much of its power from the King, it came through a grant of franchise (frequently purchaser) usually not carrying a concept of agency. The county officials carried out the business of the King and collected the King's revenues, but the borough officials often resisted the King. Thus, early, the general feeling became that a borough was a local corporate entity, having an arms-length and bargaining relationship with the King, while the county was composed of the King's agents going about the King's business. During the Colonial period, this general feeling about the difference between a county and a city was transferred to the North American Colonies. A number of different plans of organization for both city and county were adopted in the colonies, depending somewhat on the origin of the first settlers in a particular colony. In the Southern States, after the American Revolution, the county was regarded as a convenient subdivision of the State through which the State functioned,[3] whereas the cities were separate entitles, deriving their corporate powers from the State, but not through agency so much as by grant of charter for local purposes. Still, they had many general duties in the nature of agency imposed by the State. Both cities and counties are now held to be subdivisions of the State[4] and the trend of American Constitutional Law for the last fifty years has been to decrease the corporate independence of cities. This is a part of the general trend toward centralized government.

Our cities are not and have never been independent of the State government. The belief that cities were organisms independent of the State reached high tide in Texas in the period 1903-1909. It was based on Judge Cooley's "right of local self-government." This inherent right of local self-government originated in a misunderstanding of the origin of the English borough. It caused the now famous split bewteen this court and our Court of Criminal Appeals. The dispute arose over the validity of ordinances of the City of Galveston. Following a disastrous flood, the Legislature issued a new charter to the City of Galveston in which the Mayor was appointed by the Governor. The Court of Criminal Appeals held that the appointment of the Mayor by the Governor was unconstitutional because it violated the inherent right of local self-government and therefore all criminal prosecutions under city ordinances were void.[5] This court held that the civil ordinances were valid be-

3.—Bexar County v. Linden, 110 Texas 339, 220 S.W. 761.
4.—Harris County Drainage Dist. #12 v. City of Houston, Com. App. 1931, 35 S.W. 2d 118.
5.—Ex Parte Lewis, 45 Texas Crim. Rep., 1, 73 S.W. 811.

cause a city is a creature of the State and is defined by the State Constitution and the Legislature.[6] This holding reaffirmed a denial of inherent constitutional rights and was bottomed upon the proposition that all of our Constitution is written. As then written, it did not give the cities any right to local self-government. The debate between the two courts continued for a number of cases until the Court of Criminal Appeals finally abandoned Judge Cooley.[7]

In 1912 the people of Texas adopted the Home Rule amendment and the Legislature conferred upon Home Rule cities the "full power of local self-government" (Article 1175, Vernon's Civ. Stat.) so long as the city's acts were consistent with the general laws. The *inherent* right of local self-government as distinguished from a written constitutional right was buried in the case of City of Trenton v. State of New Jersey, 262 U. S. 182, 67 L. Ed. 937, 43 Sup. Ct. 534, 537. The court said:

"In the absence of state constitutional provisions safe-guarding it to them, municipalities have no inherent right of self-government which is beyond the legislative control of the state. A municipality is merely a department of the state, and the state may withhold, grant, or withdraw powers and privileges, as it sees fit. However great or small its sphere of action, it remains the creature of the state, exercising and holding powers and privileges subject to the sovereign will." See Barnes v. Dist. of Columbia, 91 U.S. 540, 544, 545, 23 L. ed. 440, 441.

A city cannot plead constitutional rights (such as due process or equal protection) against an act of the Legislature because a city is a creature of the Legislature and a mere subdivision of the State government for the purpose of carrying out the functions of State government.[8] While it is a subdivision of the State, it still does not have an agency relationship to the State in its corporate or proprietary function.

Both cities and counties are comparable entities in that they can sue and be sued in their own name. They can both, to a limited extent, hold property in their own name, subject, however, to a limited control and disposition by the Legislature.[9] They can both be corporate debtors. So far as I know, there is

---

6. Brown v. City of Galveston, 97 Texas 1, 75 S.W. 488.

7.—Ex Parte Anderson, 46 Texas Crim. Rep., 372, 81 S.W. 973; Mantel v. State, 55 Texas Crim. Rep., 456, 117 S.W. 855.

8. City of Newark v. State of New Jersey, 262 U.S. 192, 67 L. Ed. 943.

9. Robbins v. Limestone County, 114 Texas 345, 268 S.W. 915; Love v. City of Dallas, 120 Texas 351, 40 S.W. 2d 20.

no function of city government which cannot be performed by a county, if the Legislature wishes to have it so performer, and likewise there is no function of county government which cannot, within the discretion of the Legislature, be delegated to a city. It is said that one main difference is that cities have a charter and counties do not.

Therefore, when the Constitution and the Legislature declare that a water improvement district shall be a "body politic and corporate" it does not classify it either as more nearly like a county or city because both are bodies politic, and both are corporate.[10] Although at one time most counties were not considered to be bodies corporate, now the county is often referred to as a quasi-corporation and actually has a great many corporate characteristics. And although cities came into existence by charters from the King (granting some independence from the Crown), the trend in American decisions has been to make the city a dependent subdivision of the state government. As a result, disputes between the cities and the central state government are "political" and so the cities are constantly engaged in legislative battles.

Therefore, we see that while cities and counties have a widely divergent background and growth, the distinction between them as entities now rests largely within the discretion of the Legislature. Throughout the United States, the trend is away from the original historical distinction in structure. They are slowly coming to be very much alike.[11]

---

10. *Comanche County v. Burks*, CCA 1914, 166 S.W. 470.
11. *County Goversment Across the Nation,*—Wager.

"Though a distinction needs to be made between a city as a municipal corporation and a county as a quasi-corporation, the distinction should not be exaggerated. Both are creatures of the state, both get their powers from the state, and what the state gives it can withdraw or hedge about with restrictions. If the state has seemed to treat the city like an adult and the county like a minor child, the explanation can be found in the relative preponderance of the two types of functions which each performs, namely, governmental and proprietary. The former embraces functions performed on the insistence of the state, such as law enforcement and the provision of roads and schools, which cannot be charged for on a service basis. The latter includes the provision of water, lights, garbage collection, hospitals, libraries, and other services which are locally initiated, can be charged for on a service basis, and even may have been provided formerly by private individuals or corporations. When a local unit is engaged in carrying on a governmental function, the state grants it immunity from suit for damages, but when it is engaged in a proprietary function such immunity is not granted. Since counties in the aggregate make up the state, the state has used them as instrumnets for carrying out governmental functions, and they have had few proprietary functions. On the other hand, the cities have been incorporated mainly to perform proprietary functions and have had relatively few governmental functions. Hence, the larger immunity granted to counties has been due mainly to the character of their operations. If they should undertake proprietary functions to an increasing extent, as they inevitably will, their status will become more like that of cities. * * *"

In the City of Galveston v. Posnainsky, 62 Texas 118, this court emphasized that counties are created by the Legislature without regard to the wishes of their inhabitants while cities are created in response to the express desire of their inhabitants. The court said:

"Counties and like quasi corporations are created by the legislature by general laws without reference to the wish of their inhabitants, and thus for essentially public purposes.

"Not so with towns and cities which are incorporated through special charters, which, like most special laws are enacted at the request of those who are to be most directly benefited by them and with a view to this end.

"The one is created for a public purpose as an agency of the state through which it can most conveniently and effectively discharge the duties which the state, as an organized government, assumes to every person, and by which it can best promote the welfare of all."

"The other, while to a given extent created for a public purpose, is so mainly for the reason that the existence of large towns and cities makes a system or degree of police there necessary which is not so in villages nor with a rural population; but the main and essential purpose for which they are created is the advantage of the inhabitants of the corporation, and in so far as such corporations receive and exercise powers other than such as would be exercised by the state in and through the county organizations, this is essentially true."

For tort liability, the line of demarcation between cities and counties in Texas was drawn by the cases of City of Galveston v. Posnainsky, supra, and Heigel v. Wichita County, 84 Texas 392, 19 S.W. 562. In the Posnainsky case a city was held to be liable in tort and in the Heigel case a county was held not liable. In writing for this court in the Posnainsky case Justice Stayton gave the following reasons:

1. "No action lies against a subdivision of a state 'created solely for a public purpose by a general law applicable to all such subdivisions' unless given by statute.

2. "In so far as a quasi corporation exercises powers exclusively public in their character, forced upon it without its consent, simply because the state can thus, through such local agencies, more easily and effectively discharge duties essentially its own, it is but proper that no action should be maintained against it for the negligence, or even misfeasance, of its officers,

unless the action be given by an expression of the same sovereign will which arbitrarily imposed the duty.

3. "Counties are created by general laws, and while they are municipal corporations in a restricted sense, they are involuntarily so, and sustain to the state a relationship which a town or city incorporated does not sustain. They are created to carry out a policy common to the whole state, and not mainly to advance the interest of the particular locality, and to bring advantage or emolument to the inhabitants of that municipality.

"It would seem that, in so far as municipal corporations of any class, and however incorporated, exercise powers conferred on them for purposes essentially public—purposes pertaining to the administration of general laws made to enforce the general policy of the state,—they should be deemed agencies of the state, and not subject to be sued for any act or omission ocurring while in the exercise of such power, unless, by statute, the action be given; that, in reference to such matters, they should stand as does sovereignty, whose agents they are, subject to be sued only when the state, by statute, declares they may be."

4. "Persons or corporations that voluntarily assume and undertake the performance of a work, even though it be *quasi* public in its character, ought to be held to impliedly contract that they will exercise due care in its performance, and for a neglect in this respect should be liable for the resulting damage.

"We do not wish, however, to be understood to assert that there is a contract between the state and a municipal corporation accepting a charter, but simply to assert that, when such a corporation accepts a charter giving defined powers, the law imposes the duty of faithfully exercising them, and gives an action for misfeasance or neglect in this respect to any person who may be injured by such failure of duty."

* * *

" 'The grant by the state to the municipality of a portion of its sovereign powers, and their acceptance for these beneficial purposes, is regarded as raising an implied promise on the part of the corporation to perform the corporate duties, and as imposing the duty of performance, not for the benefit of the state merely, but for the benefit of any individual interested in its performance.'

"How far counties ,as municipal corporations, if at all, may be liable for injuries resulting from misfeasance or neglect, it is unnecessary in this case to inquire.

"In so far, however, as they exercise powers not of this character, voluntarily assumed—powers intended for the private advantage and benefit of the locality and its inhabitants—there seems to be no sufficient reason why they should be relieved from

that liability to suit and measure of actual damage to which an individual or private corporation exercising the same powers for a purpose essentially private would be liable."

From this it is clear that Justice Stayton was within the Anglo-American concept of recognizing a difference between a grant of power and an appointment as agent. There is this big difference between the English colonial and the modern American county. In colonial times in England the King appointed the key county officials while now we elect them. And this difference probably takes most of the real meaning out of the traditional distinction between a grant of power and an appointment as agent.

In the case of Heigel v. Wichita County, supra, in an opinion written by Justice Gaines in 1892, this court sustained a demurrer to a personal injury claim against a county based upon negligence in maintaining a defective bridge. The court held:

(1)   In the Posnainsky case it is held that a city is liable under similar circumstances, but "the opinion in that case recognizes the doctrine that a different rule applies as to counties."

(2)   " * * * That cities may be made to respond in damages for injuries resulting from a failure to discharge their corporate duties, is affirmed by the courts of this country with practical unanimity. At the same time it is very generally held, that counties are not liable for similar injuries unless such liability be created by statute, either by express words or by necessary implication. * * * "

(3)   " * * * Counties are not corporations in the fullest sense of that term. They are commonly called quasi corporations. They are created by the State for the purposes of government; their functions are political and administrative, and the powers conferred upon them are rather duties imposed than privileges granted. Cities, on the other hand, are deemed voluntary corporations; and while they exercise political functions, it is considered that their charters are granted not so much with a view to the interests of the public as for the private advantage of their citizens. It is upon this distinction that the courts ordinarily base the difference in the rule of liability as applied to municipal corporations proper and to quasi municipal corporations such as counties and townships. Other courts hold, that since a county is but a political subdivision of the State, a suit against the

county is in effect a suit against the State; and that therefore an action will not lie without the consent of the Legislature.***"

What the court says in the Posnainsky case may be summarized as follows:

1. A county is not but a city is created in response to the desire of its inhabitants.

2. A county is created to carry out functions which are general and statewide. A city is created to perform functions special and local to its inhabitants but may also perform general and state-wide functions.

3. No action can be maintained against either a city or county for the negligence or even misfeasance of its officers in the performance of a general duty unless permission to sue be given by "an expression of the same sovereign which arbitrarily impose the duty" * * * i. e., the legislature.

4. Actions may be maintained against both cities and counties where they "voluntarily assume and undertake the performance of a work * * * intended for the private advantage and benefit of the locality and its inhabitants" because they impliedly contract that they will exercise due care.

What the court said in the Heigel case may be summarized as follows:

1. It is generally held that cities are liable for failure to perform their corporate duties while counties are not liable for "similar injuries" unless liability be created by statute.

2. Counties are not full corporations and their duties are political and administrative. County powers are duties imposed rather than privileges granted.

3. Cities are voluntary corporations whose charters are granted for the private advantage of their citizens.

The two cases cannot be completely reconciled. Justice Stayton states (as dicta) that a county would be liable for torts committed while acting in a proprietary capacity while Justice Gaines states the opposite (also as dicta).

I have found no Texas case directly passing on a county's liability for tort while acting in a proprietary capacity. In the

case of Cameron County Water Improvement Dist. No. 1 v. Whittington,[12] CCA 1927, no writ history, 297 S.W. 868, 869, the court said:

"The declaration of the Constitution that irrigation and improvements connected therewith are 'public rights and duties,' and that water improvement districts 'shall be governmental agencies and bodies politic and corporate with such powers of government and with the authority to exercise such rights, privileges and functions concerning the subject-matter of this amendment as may be conferred by law' (Const. art. 16, § 59; Rev. Stats. 1925, art. 7731), is not infringed or interfered with by holding that the district was liable for the torts of a watchman employed, not to advance some interest of the state, but to conserve the interest of the corporation alone (Dillon Mun. Corp. § § 1634 to 1650)."

20 C.J.S. § 218 at page 1071 follows Justice Stayton's views that a county would be liable for a tort committed in a proprietary capacity. It says:

"On the other hand, a county constructing or maintaining a public work or improvement in a private, proprietary, or voluntary capacity is liable for injuries in connection therewith; * * *"

This view seems to be generally accepted throughout the United States. In American Jurisprudence, § 51, p. 218, is the following statement:

"The reason given for the nonliability of counties for injuries caused in the performance of governmental functions—namely, that a county should not be held liable in respect of an act which it performs as an arm of the state any more than the state itself

12. In Hodge v. Lower Colorado River Authority, Texas Civ. App., 1942, 163 S.W. 2d 855, error ref. W.O.M. is the statement that the Whittington case had been overruled by Jones v. Jefferson County Drainage Dist. No. 6, Texas Civ. App., 1940 139 S.W. 2d, 861, error ref., and by Peters v. Matagorda County Drainage Dist. No. 1, Texas Civ App., 1940, 1946 S.W. 2d 779, er. ref., I do not so construe the refusal of the writ in these two cases. In addition to irrigation, drainage districts are organized under the police power for the preservation of the general public health (a governmental function). In Wharton County Drainage District No. 1 v. Higbee, Texas Civ. App. 1912, 149 S.W. 881, 386, er. ref., the court said:
"It will be observed that something else enters into the question of the creation of such districts than the benefit to or enhancement of the value of the lands in the district. The court must find that the drainage will 'be conducive to the public health or be a public benefit or utility,' as a prerequisite to the creation of the district. These are matters that fall peculiarly within the general police powers of the state."

should be deemed liable—is not applicable where the county is engaged in a proprietary capacity when the injury for which it is sought to be held was inflicted. The possibility of the exercise by a county of private or proprietary functions, with a consequent loss of immunity from liability, is recognized in many cases. * * *"

In Henderson v. Twin Falls County (Sup. Ct. Idaho) 50 P. 2d 597, 101 ALR 1151, the court said:

"* * * * The advance of counties into fields of private enterprise did not commence as early and has not progressed as rapidly as that of the cities, so that the liability of a county for its torts in private enterprise has not become so well settled. However, it was somewhat recently held by the Supreme Court of Pennsylvania, in Bell et ux. v. City of Pittsburgh and Allegheny County, 297 Pa. 185, 146 A. 567, 64 A.L.R. 1542, that a county is liable for the negligence of its employees in operating an elevator in a city and county building, jointly owned, maintained, and operated by the county and the city of Pittsburgh, partly for business and partly for governmental purposes, although the person injured was on the way to the office of a governmental department of the city, and that a county which engages in activities not of a governmental nature is liable for the torts of the employees therein. See, also, Cleveland v. Town of Lancaster et al., 239 App. Div. 263, 267 N.Y.S. 673."

In the A.L.R. annotation following this case is the following comment (101 A.L.R. 1169):

"* * * The few cases involving the exercise of proprietary or private functions are unanimous in holding the county liable for injuries arising in connection therewith."

The old basis for exempting the sovereign from tort liability was cast in the maxim: "The King can do no wrong." The decision of most feudal law turned on procedural points. This maxim was based in part on the proposition that the King could not be sued in his own court. Since the feudal lord was the presiding officer of his own court and since it was recognized that the same man cannot be both litigant and judge, he was usually held to answer in the court next above him. However, when the King was the defendant, there was no one above him to hold court. This difficulty could be overcome by a sovereign grant of permission to sue. Now there are many torts for which gov-

ernment can be held liable if the litigant secures permission to sue. [13] Yet the maxim "The King can do no wrong" is not now altogether procedural. There are cases which recognize certain fields of governmental activity for which there is no liability, even though permission to sue be obtained. [14] When government acts in a proprietary capacity a plaintiff does not need permission to sue. Neither can the Legislature exempt a city from liability when it acts in a proprietary capacity.[15]. Would we exempt from tort liability a county operating a street car line? Or an electric power distribution system? Or a waterworks for drinking and domestice use? I think not. We should hold a county liable for its propietary torts just as a city would be and consequently hold liable all shades of governmental entities lying between them.

There is a correct analysis of those questions in Holderbaum v. Hidalgo County Water Improvement Dist. No. 2, CCA 1927, 297 S.W. 865, affirmed in 11 S.W. 2d 506, where the court said:

"Primarily, a water improvement district is in no better position than a city is when exercising its purely local powers and duties. Its general purposes are not essentially public in their nature, but are only incidentally so; those purposes may be likened to those of a city which is operating a waterworks system, or an irrigation system, such as in the Ysleta Case. A water improvement district can do nothing, it has and furnished no facilities, for the administration of the sovereign government. Its officers have no power or authority to exercise any of the functions of the general government, or to enforce any of the laws of the state or any of its other subdivisions, or collect taxes other than those assessed by the district. They have no more power or authority than that of the officers of a private corporation organized for like purposes. As a practical matter, the primary objects and purposes of such district are of a purely local nature, for the district is created and operated for the sole benefit of its own members, and an analysis of these objects and purposes discloses that they directly benefit only the landowners who reside within and whose lands form a part of the district, to the exclusion of all other residents therein. It is true, of course, that the state and the general public are greatly benefited by the proper operation of the district, and to that extent its

---

13. The case of State v. Elliott, CCA 1919, wr. er. ref., 212 S.W. 695, would seem to hold the State liable for a proprietary tort (Operation of a railroad).

14. State v. Brannan, CCA 1937, wr. er. ref., 111 S.W. 2d 347.

15. Operation of street cars. City of Amarillo v. Tutor, Com. App. 1924, 267 S.W. 698.

objects and accomplishments are public in their nature, but this characteristic is only incidental to the primary and chief object of the corporation, which is the irrigation of lands forming a part of the district. It is obvious, then, that the purpose and duties of such districts do not come within the definition of public rights, purposes, and duties which would entitle the district to the exemption raised by the common law as a protection to corporations having a purely public purpose and performing essentially public duties."

As long ago as 1894, in Ysleta v. Babbitt, supra, it was held that the distribution of irrigation water was local within the meaning of the Posnainsky case. The court said:

"We are of opinion that by this article the city was authorized to assume the control and regulation of the water supply by means of this acequia, not only for domestic uses, but also for purposes of irrigation, within its limits; and, if it did so, it was obligated to permit its use in due proportion by those who had entitled themselves to it. Holman v. Pleasant Grove City (Utah) 30 Pac. 72. By assuming these functions and exercising them through officers of its selection, the city would be liable in damages for the negligence or other tortious acts of its officers done in the course and within the scope of their duties. The operation of this system of water supply was a subject of purely local benefit, and does not fall within those acts of a governmental character which a city may perform without liability to individuals. City of Galveston v. Posnainsky, 62 Texas 127; Wagner v. City of Rock Island, 146 Ill. 139, 34 N.E. 545; Dill Mun. Corp. § 966. * * *"

The same test has been applied as recently as Calhoun County Canal Company v. Richman, CCA 1954, error ref., n.r.e., 264 S.W. 2d 738.

Art. 7731, V.A.C.S., under which this unit was organized, specifically provides that it shall be a body corporate and Art. 1302 defines irrigation as a corporate function. The Josnainsky case is unquestionably the leading Texas case in this field, has been cited a great number of times, and was quoted with approval in City of Dallas v. Smith, 130 Texas 225, 107 S.W. 2d 872. We should follow it.

Plaintiff contends that Art. 4671, V.A.C.S. (death act) grants permission to sue, but even if there be no legislative grant of authority to sue this particular unit, it should be suable without

it under the tests presented by Justice Stayton in the Posnainsky case. They are:

1. Was the unit created voluntarily or involuntarily by its inhabitants?

2. Was it created "to carry out a policy common to the whole State, and not mainly to advance the interest of the particular locality, and to bring advantage or emolument to" its inhabitants?

3. Was the falure of performance for which it is sued a function general and statewide or special and local to its inhabitants?

Art. 7729, V.A.C.S. and other related statutes provide for the organization of this district only after a favorable vote of the inhabitants, so it cannot be other than a voluntary creation of its inhabitants.

Under these facts, I would hold:

(1) That this unit was created voluntarily to bring advantage to its inhabitants.

(2) That the distribution of water to particular l a n d s through an irrigation system is special and local.

Since the distribution of water for irrigation, including maintenance of an irrigation system, has been and still is legally performed on a proprietary basis for profit, I would hold this to be a proprietary and not a governmental function.

The Lower Colorado River cases[16] are not in point on tort liability because, first, the building of the dams was done to prevent floods as well as sell power, and, second, because this authority was created under a special act of the Legislature and not by consent of its "inhabitants" if it can be said to have any. The Case of Willacy County Water Control & Improvement Dist. No. 1 v. Abendroth, 142 Texas 320, 177 S.W. 2d 936, does not involve tort liability but garnishment. The majority cites no case

16.—Lower Colorado River Authority v. McGraw, 125 Texas 268, 83 S.W. 2d 629; Hodge v. Lower Colorado River Authority, CCA 1942, 163 S.W. 2d 855; Lower Colorado River Authority v. Chemical Bank & Trust Co. CCA 1954, 185 S.W. 2d 461, affirmed, 144 Texas 326, 190 S.W. 2d 48. In the Hodges case a writ of error was granted. Defendant then paid a substantial amount in settlement.

holding either a county or water district exempt from tort liability when acting in a proprietary capacity.

When a water improvement district commits a tort in the performance of a purely local function done to advance the interest of the particular locality and to bring advantage to its inhabitants, it should be held liable for its negligence, just as a city or public utility would be under similar circumstances. This would make of it more of a legal entity, would be a step in decentralizing government, would impose upon government the same liabilities as now rest upon a privately owned irrigation company, and would give our people protection against governmental invasion of their rights by tort.

Opinion delivered July 21, 1954.

Rehearing overruled December 1, 1954.